**UNITED STATES of America, Appellee,**

**v.**

**Samuel Mark CORAN, Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

**v.**

**Deborah C. TALLENT, Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

**v.**

**Mary Ann SCHURMANN, Defendant, Appellant.**

**Nos. 78–1114 to 78–1116.**

United States Court of Appeals, First Circuit.

Argued Sept. 14, 1978.

Decided Dec. 26, 1978.

Matthew H. Feinberg, Boston, Mass., by appointment of the Court, for appellant, Samuel Mark Coran.

Melvin Ravech, Boston, Mass., for appellant, Deborah C. Tallent.

Joan C. Schmidt, Boston, Mass., with whom Joseph J. Balliro, Boston, Mass., was on brief for appellant, Mary Ann Schurmann.

Kevin J. O'Dea, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, KUNZIG,* Judge, U.S. Court of Claims, DUMBAULD,** Senior District Judge.

DUMBAULD, District Judge.

The Travel Act of September 13, 1961, 75 Stat. 498–99, 18 U.S.C.A. § 1952, for violation of which defendants-appellants were convicted,[1] provides as follows:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling, liquor on which

* Sitting by designation.

** Of the Western District of Pennsylvania, sitting by designation.

1. The female defendants, Deborah C. Tallent and Mary Ann Schurmann, were convicted of substantive violations of the Travel Act (Count III of the Indictment), as well as of conspiracy (under the general conspiracy statute, 18 U.S.C. § 371) to violate the Travel Act (Count I). The male defendant, Samuel Mark Coran, was likewise found guilty of conspiracy but was acquitted of the charge of substantive violation (Count II) by causing the travel of the female defendants (18 U.S.C. § 2).

the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

This legislation was enacted as part of Attorney General Robert F. Kennedy's attack on organized crime. It was specifically directed "against the racketeer who conducts an unlawful business but lives far from the scene in comfort and safety, as well as against other hoodlums. . . . Obviously, we are not trying to curtail the sporadic, casual involvement in these offenses, but rather a continuous course of conduct sufficient for it to be termed a business enterprise." [2]

Accordingly, to establish a violation of the statute the Government must prove: (1) interstate travel (or use of interstate facilities); (2) with intent to promote or facilitate an unlawful activity (to wit, in the case at bar, a "business enterprise involving . . . prostitution offenses in violation of the laws of the State in which they are committed"); (3) followed by performance (or attempted performance) of acts promoting or facilitating such unlawful prostitution.

The crucial issue in the case at bar is the existence *vel non* of intent to promote a "business enterprise" involving prostitution offenses in violation of the laws of Maine, where the sexual conduct here involved took place.[3]

The female defendants contend that they are merely actresses, dancers, or entertainers and that they proceeded to Lewiston to engage in what was to be nothing more than a theatrical performance; and that the sex acts were a casual and spontaneous response to propositions made after their arrival in Maine, and hence that the element of intent required by the statute in order to convict them did not exist at the time they crossed the state line. This would be a good defense if it had been believed by the jury. However, the jury's finding to the contrary is supported by adequate and substantial evidence in the record. The court in its charge squarely and fairly instructed the jury that the female defendants could not be convicted unless they "specifically intended to carry on and facilitate the carrying on of prostitution."

There was overwhelming evidence that the male defendant operated a large-scale prostitution enterprise,[4] with which the female defendants were associated, insofar as the trip to Maine was concerned.

Robert Skinner, a government informant (who was an ex-convict and had a drug charge dismissed for cooperation, but was evidently believed by the jury notwithstanding an appropriate cautionary instruction by the Court), testified that he was in the apartment where the male defendant lived with the female defendant Deborah

2. *Rewis v. U. S.,* 401 U.S. 808, 811–12, 91 S.Ct. 1056, 1059 n. 6, 28 L.Ed.2d 493 (1971). Accordingly the Court decided in *Rewis* that the act was not violated by travel by *customers* of the enterprise, even though such travel might have been reasonably foreseen by the operators of the enterprise. The legislative history is further discussed in *Erlenbaugh v. U. S.,* 409 U.S. 239, 244, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972).

3. Regarding the other two elements of the offense, it is indisputable that the female defendants traveled from Massachusetts to Maine in a beige Lincoln provided by the male defendant, and that acts of prostitution subsequently were performed in a motel at Lewiston, Maine. Defendant Tallent's brief says: "It is conceded by the defendant that she traveled to Maine with the other female defendant and that she engaged in sexual activity for money." The identical statement occurs in defendant Schurmann's brief. In the male defendant Coran's brief: "It is conceded that co-defendants traveled to Maine and that they were engaged in sexual activity for money."

4. Indeed, one of the points urged by Coran as prejudicial was the informer's comprehensive description of Coran's establishment in Boston. The informer also narrated Coran's conversations describing his extensive experience in the business and his familiarity with the laws of many states on the subject. (Tr. I) This testimony was properly admitted to establish that a "business enterprise" rather than a sporadic or casual biological urge was involved in the case at bar.

Tallent, when a phone call was received by Deborah from "two steadies in Maine." Coran explained to Skinner that they "need some girls up there," that there was to be a convention with "maybe 300 guys." He said they were short a girl, and asked Skinner to provide one. Skinner made a phone call, ostensibly to locate another prostitute, but actually for the purpose of alerting government agents. Deborah put her luggage in Coran's Lincoln town car but came back "and waved her vibrator and said, 'I almost forgot the most important thing.'" (Tr. I, 15–19, 47) (Hereafter the day of trial will be indicated by roman numerals.)

Deborah Tallent picked up Mary Ann Schurmann in Boston and told her "Mark told us to get going out of Boston by 1:30." Schurmann phone for another girl who was pre-engaged, and Tallent said "Oh well, we will have to handle it together." (Tr. I, 82).

Coran later told Skinner, after completion of the mission to Maine "that they really made a bundle of money. He had a pocket full of money. He threw it on the bed—about two or three grand. He said, 'listen, you really should have got some girls. You should have come up with the girls. They made a nice stash on this.'" (Tr. I, 25).

This evidence sufficiently establishes that the three defendants were united in a plan or enterprise having as its object the commission of unlawful prostitution offenses in Maine. In the execution of the conspiracy interstate travel and use of interstate facilities was contemplated and in fact took place.

With respect to the requirement that the "prostitution offenses"[5] must be "in violation of the laws of the State in which they are committed," defendants contend that the Maine law prohibiting prostitution[6] is unconstitutional and void, as a violation of an asserted federal constitutional right to "privacy."

Whatever view one may take of the scope of "privacy,"[7] which as counsel indicated at argument is an unsettled and developing area of the law,[8] it seems clear that defendants in the case at bar are not entitled to the benefits of such protection as the law of "privacy" might afford under appropriate circumstances. They are foreclosed by the well-settled and longstanding rule that "[o]ne who would strike down a state statute as obnoxious to the Federal Constitution must show that the alleged unconstitutional feature injures him."[9]

5. This expression adequately identifies the nature of the offense prohibited by Maine law, even if the terminology or nomenclature in the state law were different from the words used in the federal statute. *U. S. v. Nardello,* 393 U.S. 286, 293–95, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969). But Maine law prohibits prostitution *eo nomine* as well as other kindred offenses.

6. Maine Revised Statutes Annotated Title 17–A, § 851 defines prostitution as "engaging in, or agreeing to engage in, or offering to engage in sexual intercourse or a sexual act . . . in return for a pecuniary benefit to be received by the person engaging in prostitution or a 3rd person." § 853–A makes it a crime for a "person" to engage in prostitution as so defined. Other provisions (§§ 852, 853, 854) punish kindred offenses denominated "promotion of prostitution," "aggravated promotion of prostitution," and "public indecency." Since Maine law speaks of persons rather than females, no equal protection question is raised. Defendants' comments on Massachusetts law are immaterial surplusage since the prostitution here involved took place in Maine.

7. The chief authority on this topic is the rather nebulous or "penumbral" pronouncement adumbrated in *Griswold v. Connecticut,* 381 U.S. 479, 482, 485, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

8. In this connection, see Note on "The Privacy Opinions of Justice Douglas," 87 Yale L.J. 1579 (July, 1978). Appellant Schurmann's brief argues that "Serious question exists as to whether prostitution can still be considered a crime in light of recent constitutional trends. . . . [P]rostitution is a 'victimless' crime." This argument is more appropriately addressed to the legislature.

9. Mr. Justice Brandeis in *Premier-Pabst Co. v. Grosscup,* 298 U.S. 226, 227, 56 S.Ct. 754, 755, 80 L.Ed. 1155 (1936). Recent reaffirmation of the same rule is to be found in *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and many other cases.

The testimony clearly shows that the female defendants here did not operate discreetly with any pretensions to privacy, but publicly solicited potential customers.

Upon their arrival at Lewiston, the female defendants after a telephone call to Roland Tanguay (the president of the Montagnard Club who had made the call to Boston to obtain the services of the girls for the club's stag show) were each provided with a room at the Ramada Inn. Tanguay and Donald Rioux, a maintenance man at the club, came to escort them to the club (Tr. II, 37). Before leaving the motel, however, Tanguay went into one room with the female defendant Schurmann, and Rioux into the other room with the female defendant Tallent. (Tr. II, 37, 44). According to Rioux's testimony "she performed oral sex on me" and "I put $20 on the bureau." (Tr. II, 43–44).[10] Tanguay had given him the money when he said he "couldn't afford it" (Tr. II. 46, 117–118).

The "exotic dancing" performance put on by the female defendants at the club was itself sexually suggestive. While nude (Tr. II, 62 [Rioux], 149 [Schurmann], 198 [Tallent]), they took one man out of the audience and wrestled him down to the floor, onto a red blanket. (Tr. II, 62 [Rioux], 70 [George Rouleau, vice president of the club]). According to defendant Schurmann, they were "just fooling around . . . dancing, and you know" (Tr. II, 172). According to defendant Tallent "We just danced with him." (Tr. II, 237). No witness testified that any sexual activity took place, though the Government's brief states that "[d]uring the show they performed sexual acts with an unidentified member of the Montagnard Club".

After the show, both female defendants circulated among the male audience drinking at the bar and solicited sexual intercourse, specifying $25 as the price and the Ramada Inn as the place (Tr. II, 92–96, 119–20). According to defendant Schurmann, it was she who was "propositioned" by the men. They "asked me if I wanted to have sex" and "offered money."

Q. What was said? Anything about money?
A. They offered money.
Q. How much?
A. Twenty-five dollars.
Q. And what did you say?
A. Well, I said, "All right."
Q. Did you tell them that you would be back at the Ramada Inn?
A. Yes.
Q. And did you later go back to the Ramada Inn?
A. Yes.
Q. Go to your room?
A. Yes.
Q. Did you engage in sexual activity for money with some person in your room?
A. Yes.
Q. How many persons?
A. Probably two, maybe three.
Q. And were you paid some money?
A. Yes. (Tr. II, 142–43).

Some men preceded the female defendants back to the motel, to show them the way. Later other men followed. They were noisy and milling around in the hallway of the motel. (Tr. I, 99; II, 199–201). The government agents saw the female defendants going in and out of the bedrooms, and also observed men going in and out of those rooms (Tr. I, 100). After an argument between the two defendants, they returned to Boston, leaving at about a quarter to one (Tr. II, 107–109). Defendant Schurmann testified that she spent about an hour and a half at the motel before departing for Boston, and came out of her bedroom and went to the lounge for a drink, between the visits of her customers (Tr. II, 143–44). After the defendants had left, officers entered one of the bedrooms, and found beds in disarray, and "used con-

10. According to Rioux, Tallent "asked me if I wanted to have sex with her." Tr. II, 43. According to Tallent the initiative was taken by Rioux. "He wanted to have sexual activities . . . He was messing around with me and then he pulled his pants down." *Ibid.*, 195–96, 235.

doms in the waste can, empty vodka bottle on the dresser" (Tr. I, 101–102).[11]

The foregoing testimony regarding promiscuous solicitation at the bar in the club, followed by throngs of men noisily milling around in the corridors and lounge of the Ramada Inn, with the comings and goings of the female defendants and of men into and out of the motel bedrooms, clearly negates any claim that the female defendants could cherish any "reasonable expectation of privacy" [12] under the circumstances.

Since, therefore, the defendants in the case at bar are not in a position to invoke whatever rights of "privacy" might under other conditions be available to other parties, the constitutionality of the Maine statute against prostitution must be assumed *arguendo* for purposes of this case, and hence the Government has succeeded in establishing every element required to prove a violation of the Travel Act.

This conclusion makes it unnecessary to examine the Government's contention (Brief, p. 10) that a Travel Act conviction should be sustained even if the state law violated were unconstitutional.[13] It may plausibly be argued that Congress referred to state law only "for definitional purposes," [14] and that the Travel Act established as a federal offense travel to promote a purpose condemned by state public policy, even if such policy lacked legal or constitutional sanction. In other words, instead of adopting as a definition of "prostitution offenses" the core concept of "sex for pay," Congress chose to adopt whatever definition of kindred offenses the state might have enacted, even with a difference of terminology.[15] The analogy of gun laws prohibiting possession of weapons by persons "convicted" of crime might be invoked.[16] However, even if the unconstitutionality of the state law were deemed immaterial, the defendants could probably invoke the same arguments about "privacy" against the federal statute embodying the incorporated definition of sex offenses. We therefore do not pass upon the validity of this contention advanced by the Government.

It remains to discuss a question raised by defendants regarding admissibility of certain evidence, namely brief extracts from the grand jury testimony of Rioux and Rouleau. (Tr. II, 117–18 [Rioux], 119–20 [Rouleau]). These statements were first used in the attempt to refresh the recollection of the witnesses, but without satisfactory results.

In the case of Rioux, the question was whether Tanguay had given him the $20 which he put on the bureau in Tallent's room. The grand jury statement showed that Tanguay was the source of the money. The witness had already testified at the trial that he could not afford to engage in sex with one of the girls, but that Tanguay said "it wouldn't cost anything" (Tr. II, 46). The prosecutor thought that Tanguay's paying money for the girls so soon after their arrival bore on the issue of intent (Tr. II, 49–50). But Tanguay was acquitted, and insofar as the defendants now in the case are concerned, the source of the money received is immaterial. In the case of Rioux's statement any error would be harmless. See *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

Rouleau's statement dealt with the conduct of the female defendants after the

11. This evidence refers to room 142, which had been occupied by defendant Tallent. Defendant Schurmann was in 144, where she had oral sex with several men before leaving for Boston. Tr. II, 179–81. Defendant Tallent denied having engaged in any sex activity after returning from the club. Tr. II, 201.

12. See *Katz v. U. S.,* 389 U.S. 347, 353, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

13. *U. S. v. Hathaway,* 534 F.2d 386, 399 (C.A.1, 1976), is cited in support of this view, but no question of constitutionality was involved there.

14. *U. S. v. Forsythe,* 560 F.2d 1127, 1135 (C.A.3, 1977).

15. See note 5, *supra.*

16. See *U. S. v. McDowell,* 328 F.Supp. 606, 608–610 (W.D.Pa.1971); *U. S. v. Graves,* 554 F.2d 65, 69 (C.A.3, 1977); *U. S. v. Allen,* 556 F.2d 720, 722 (C.A.4, 1977).

show, when they circulated at the bar and solicited intercourse, specifying the price as $25 and the place as the Ramada Inn (Tr. II, 119–120). Here, too, the admission of this evidence was harmless, although it was material, because it was merely cumulative. The witness had already testified in substance to the same matters which the grand jury statement set forth (Tr. II, 92–93, 95).

Moreover, we agree with the court's ruling that Rouleau's statement at trial was in fact inconsistent with his grand jury testimony. Rouleau said that the grand jury minutes did refresh his memory and that he remembered one of the defendants speaking to him. He then testified that she asked "[i]f I liked the show and stuff, and if I liked the way she looked", but that to the best of his knowledge she did not say anything else. That testimony directly contradicts his statement to the grand jury that the defendant had solicited him to pay for an act of sexual intercourse. The prior inconsistent statement may therefore be admitted as substantive evidence for the truth of its contents under the new law established by Rule 801(d)(1)(A) of the Federal Rules of Evidence.[17]

The statements before the grand jury, being extracts from an extraneous transcript, might appropriately and conveniently be submitted to the jury in the form of exhibits, and we find no merit in the argument that their written form gave them undue importance or improperly emphasized their contents in the estimation of the jury. There were various other items of evidence submitted as exhibits, including photographs, hotel bills, and motor vehicle registrations. There is no reason to suppose that receipt of these two pages of Q and A was prejudicial in any fashion to defendants. The question is one for the sound discretion of the trial judge, and no abuse of discretion has been shown here. *U. S. v. Parker*, 491 F.2d 517, 521 (C.A.8, 1973), cert. den. 416 U.S. 989, 94 S.Ct. 2396, 40 L.Ed.2d 767 (1973).

Likewise there was no abuse of discretion in denying a mistrial when the jury submitted three questions during its deliberations, and the trial judge, after discussion in a conference with counsel for all parties, gave appropriate answers to the questions in open court.

Finally, the fact that the male defendant Coran was acquitted of the substantive count but convicted under the conspiracy count is no ground for upsetting the jury's verdict. These are separate offenses. *U. S. v. Rabinowich*, 238 U.S. 78, 85–86, 35 S.Ct. 682, 59 L.Ed. 1211 (1915). Apart from the general rule that consistency in verdicts is not required, *Hamling v. U. S.*, 418 U.S. 87, 101, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), it would not be difficult to formulate various hypothetical fact situations which would lead a jury to reach by appropriate reasoning the conclusion which it did with respect to the part played by the male defendant in connection with the illegal mission to Maine.

For the foregoing reasons, *the judgments of the District Court are affirmed.*

17. That rule provides:

A statement is not hearsay if—(1) The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition.