**UNITED STATES of America, Plaintiff,**

v.

**James HEMMER, John Cusick, Michael Marino and Thomas Randazza, Defendants.**

**Crim. No. 82–260–C.**

United States District Court,
D. Massachusetts.

April 13, 1983.

Paul F. Healy, U.S. Atty., Boston, Mass., for plaintiff.

Ignatius R. Piscitello, Lawrence, Mass., Richard C. Chambers, Alfred P. Farese, Everett, Mass., Nelson S. Baker, Boston, Mass., for defendants.

## MEMORANDUM

CAFFREY, Chief Judge.

This matter is before the Court upon defendants' motions for dismissal, mistrial, and judgment notwithstanding the verdict. The following facts are found to be true for purposes of this motion.

### I. *Facts*

On November 14, 1980, a search warrant was executed by the Gloucester Police Department at the residence of one George (Skippy) Cream, then living at Smith

Street, Gloucester, Massachusetts. A brown paper bag containing an atlas of Massachusetts towns and a sketch of the floor plan of what appeared to be a bank was found under a sofa. On the map of Gloucester in the atlas, the area of Lexington Street, the location of the Magnolia Branch of the First National Bank of Ipswich, was inked in, as well as roads leading to and from the bank. The sketch was later identified at trial by bank manager Richard Curtis to be the floor plan of the Magnolia Branch of the bank. James Hemmer was living in the residence with George Cream when the police first arrived there on November 14, 1980. George Cream presently is deceased.

On Friday, January 30, 1981, at approximately 7:00 p.m., three masked men, the tallest brandishing a knife, the shortest, a handgun, robbed the First National Bank at Magnolia, Massachusetts. Escaping out the rear door of the bank, the robbers took with them approximately $70,000.

A witness at the scene told Gloucester police that he had seen three masked men exit from the rear door of the bank, run across the parking lot to the corner of Ocean and Norman Avenues, across the street, and toward downtown Gloucester. Gloucester police subsequently found three sets of footprints in the snow, two of them sneaker prints, one of them work shoe prints. The prints led some five miles through the woods, along railroad tracks, and over a drawbridge back into the City of Gloucester. The Gloucester Police Department later made and turned photographs of the prints over to the FBI, which had assumed jurisdiction in the case. The FBI case agent in charge of the matter asked the FBI Laboratory to compare the photographed prints with a pair of sneakers taken from James Hemmer approximately a month after the robbery.

## II. *Proceedings to Date*

The defendants Hemmer, Randazza, Cusick, and Marino were charged in a three-count indictment charging all defendants with conspiracy (18 U.S.C. § 371) and armed bank robbery (18 U.S.C. § 2113(d)), and defendant Marino with possession of money known to have been taken from a bank (18 U.S.C. § 2113(c)). Defendants were tried to a jury commencing on March 2, 1983. On March 11, 1983, the jury returned verdicts of guilty on the conspiracy and bank robbery charges against Hemmer, Randazza, and Cusick and on the possession charge against Marino. The Court directed a verdict for Marino on the conspiracy and robbery counts.

During the government's direct case two facts were allegedly learned by Assistant United States Attorney Healy who tried the case for the government. In 1981, the FBI Laboratory had performed a comparison of the defendants' fingerprints (except Marino's) with money identified as having been stolen from the bank. Secondly, the FBI Laboratory in 1981 had also compared the photographs of footprints allegedly left by the robbers both in the bank and in the snow outside the bank, with a pair of sneakers seized from James Hemmer in late February, 1981. This information, as well as the reports of the test results, were then turned over to defense counsel during the presentation of the government's case.* In addition, a report of a handwriting analysis comparing the late George Cream's writing with that appearing on an atlas seized from Cream's residence on November 14, 1980, had not been provided to counsel for Cusick and Marino. It had, however, been given in September and October, 1982 to counsel for Hemmer and Randazza. Further, this report was made available to all counsel for viewing prior to trial as a possible Govern-

---

* For reasons which the Court can only guess, the experienced FBI Case Agent arrogated to himself the decision as to what evidence in the possession of the FBI was or was not exculpatory and he withheld from the Assistant United States Attorney prosecuting the case various items of information learned by him during the investigation. His performance reflects no credit on himself or the FBI and was conduct which should not have occurred at all. For the reasons articulated in this twenty page memorandum, this improper conduct did not violate any right of any defendant.

ment exhibit. Counsel for Randazza was the only attorney who elected to view the Government exhibits prior to trial. During the Government's case, counsel for Cusick and Marino were made aware of the handwriting analysis report. All the information contained within the three reports was utilized by the defendants during the cross examination and was introduced into evidence.

Further, during the Government's case, it was learned by all counsel that in April, 1981, the FBI and the Gloucester Police had interviewed a potential source of information, an alleged informant, identified only as "Bunnsie." The defendants sought to introduce this testimony and sought the name and address of the informant. The Court ruled that the informant would not be allowed to testify as the statements attributed by him to others were inadmissible hearsay. The Court did order the Government to provide the informant's name and last known address, however. The next day the Government informed the Court that it could not provide the name of the source because the source had been promised anonymity, and because his address was unknown in any event. The Court allowed the trial to proceed and reserved ruling on the defendants' motions to dismiss and for mistrial until after the jury verdict which, had it been not guilty, would have rendered the motions moot.

III. *Pretrial Non-disclosure of the Laboratory Reports*

The defendants contend that the violation of the pretrial discovery orders by the Government in failing to turn over the fingerprint, footprint and handwriting reports (defendants Hemmer and Randazza had been given this report) should result in dismissal, due to the Government's deliberate misconduct. There is no evidence, however, of bad faith on the part of the Government, and counsel for defendants do not accuse Mr. Healy of any personal misconduct. On the contrary, the delay was apparently the product of the negligence on the part of the FBI Case Agent. See *United States v.*

*Richman,* 600 F.2d 286, 291 (1st Cir.1979) and *United States v. Gladney,* 563 F.2d 491, 493–94 (1st Cir.1977).

Rule 16(a)(1)(D), Federal Rules of Criminal Procedure, provides:

Upon request of a defendant the Government shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

The Government submits that the lab reports were not intended for use by the government as evidence in chief at the trial nor have the defendants shown how they were material to the preparation of the defense.

■ I find, nevertheless, that the defendants here did receive the reports and utilize them in their defense. To succeed on a claim of a violation of Rule 16, the defendant must demonstrate how he has been prejudiced. *United States v. DeWeese,* 632 F.2d 1267, 1272 (5th Cir.1980). In *Furlow v. United States,* 644 F.2d 764 (9th Cir.1981) a police report was discovered during the trial and was made available for overnight study by the defendant's attorney and use in cross-examination. The Court of Appeals found no prejudice because the defendant did utilize this report. In *United States v. Glaze,* 643 F.2d 549, 552 (8th Cir.1981) the Court found that non-production of an inconclusive field test was not reversible error since it was "apparent that appellant's substantial rights were not prejudiced."

■ In the instant case the Court rules that defendant's rights were not prejudiced by the late production of the test results. The defendants did receive the results and utilized them at trial; it has not been shown nor is it apparent that any defense

strategy could or would have been altered by the timely disclosure of the material; there was no bad faith by the government demonstrated by the defendants; and there was no request for a continuance to digest the reports or to prepare new defense strategy. *United States v. Gladney, supra* at 493–94.

A case on point is *United States v. Principe,* 499 F.2d 1135 (1st Cir.1974) in which the Court found that tardiness in furnishing Jencks Act materials did not afford a basis for vacating the conviction. In *Principe,* the Government furnished certain Jencks Act material after the redirect examination of a witness. At the close of the Government's case, the defendant moved for a mistrial on the ground that exculpatory evidence had been suppressed. The Court denied the motion. The Court of Appeals for the First Circuit upheld the trial court's ruling on the grounds that the trial court properly weighed competing considerations in determining the appropriate course to follow. The Court stated:

> The district court was entitled to conclude that the Government's conduct fell short of being so flagrant as to warrant a mistrial regardless of prejudice, and, further, that Principe was not materially prejudiced by the belated disclosure.

*Id.* at 1139.

IV. *The Failure of the Government to Provide the Test Results Prior to Trial*

The defendants also claim that the case should be dismissed because the test results were exculpatory evidence and that their nondisclosure was a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Again, I find that the defendants had the test results and rule that they have not shown any prejudice.

In *Brady,* the Supreme Court held that suppression of favorable evidence violates due process, irrespective of the prosecutor's good or bad faith, if such evidence is material. Where a general request for information is made, as it was here, materiality exists only if "the omitted evidence creates

a reasonable doubt that did not otherwise exist." *United States v. Imbruglia,* 617 F.2d 1, 4–5 (1st Cir.1980), *citing, United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976).

The Court rules that the complained of reports were not of an "obviously exculpatory character." *United States v. Ferreira,* 625 F.2d 1030, 1033 (1st Cir.1980). Further, the omitted evidence, even if exculpatory, does not create a reasonable doubt that did not otherwise exist. The delayed evidence will be analyzed separately.

1. The handwriting report

This report concluded that George (Skippy) Cream, an unidentified coconspirator, wrote various items on an atlas recovered from Cream's residence. Defendant Hemmer was living in Cream's apartment when the Gloucester Police Department seized the atlas pursuant to a state court warrant. This was in conformity with the government's theory of the case, that is, that Cream was involved in the conspiracy and the planning stages of the robbery as well as harboring Hemmer after the robbery.

■ Hemmer, who might have some argument that he was present with Cream just before the seizure of the atlas at Cream's residence and so be affected by this report, had been provided with the report long before trial. Randazza also had been made aware of the report regarding Cream's identity well before trial. Apparently, Cusick and Marino did not receive the report prior to trial, but the government never contended other than the fact that the atlas was Cream's.

2. The photographs and footprint analysis

■ These did not tend to exculpate the defendants or to assist them in their defense. Hemmer's contention that this report shows he was not one of the robbers has no merit. The evidence was that there were photographs taken of two sets of sneaker prints and a set of work shoe prints the night of the robbery. The photographs were taken of prints in the snow and on a

counter in the bank. There was no evidence that the tall robber with the knife (Hemmer) wore sneakers during the robbery. Additionally, because one has on a pair of sneakers a month after a robbery does not justify an inference that he had those same sneakers on at the time of the robbery. I rule that this report was an investigative lead attempted by the FBI that proved fruitless, but that it in no way exculpated Hemmer from the crime.

It is to be noted that neither Cusick's nor Randazza's footwear were compared to the prints by the FBI laboratory and that the government never contended that Marino was in the bank.

### 3. The fingerprint report

■ The results of this report did not tend to exculpate the defendants. Because certain bills that had been traced to the bank did not reveal the defendants' fingerprints, it does not necessarily follow that the defendants did not touch the bills. In any event, the currency analyzed was that recovered from Eric Aitken, arguably part of the $5,000 given him as a "cut." There was no contention by the government that any particular defendant on trial touched this money. More importantly, the evidence in the case was that all the robbers wore gloves during the robbery. I rule that where they were conscious of fingerprints during the robbery and took pains not to leave any by wearing gloves it is fair to infer that they would be careful enough not to leave their fingerprints on bills that were given to Aitken, who pleaded guilty to receiving and possession of money taken in this robbery.

■ Assuming that the reports were Brady material and that through the FBI's negligence, this material was not provided, there still would have been no due process violation in this case since the disclosures of the reports did not come so late as to prevent the defendants from receiving a fair trial. United States v. McPartlin, 595 F.2d 1321, 1345–47 (7th Cir.1979). The case of United States v. Smith, 609 F.2d 1294 (9th Cir.1979) is similar to the instant case. In Smith the trial court ordered the government to turn over all Brady material to the defense three days prior to trial. A 150 page report, however, was not given to the defense until after a government witness began testifying. The Court held that the delayed production, although causing concern, did not violate due process. Finally, in United States v. Ziperstein, 601 F.2d 281, 291 (7th Cir.1979), cert. denied, 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980) the Court held that "as long as ultimate disclosure is made before it is too late for the defendants to make use of any benefits of the evidence, Due Process is satisfied."

In conclusion, I rule that even if these reports were exculpatory, the defendants received them, utilized them, and did not request a continuance because of their late production. I accordingly rule that there was no due process violation in this case concerning the failure of the government to turn over the lab reports pretrial.

### V. Disclosure of the Confidential Source

■ The law recognizes a governmental privilege to withhold from disclosure the identity of persons who furnish information of violations of law to law enforcement officers. Scher v. United States, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151 (1939). Exceptions to the general rule have arisen, however, which occasionally require disclosure of an informant's identity. Bona fide requests for disclosure may arise in two different contexts: either in a hearing on probable cause for arrest or search, McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967), or in the actual determination of guilt or innocence at trial. It is the latter situation with which we are now concerned.

The Supreme Court in Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), defined the scope of the Government's privilege of nondisclosure. Roviaro had been brought to trial on charges of possession and sale of narcotics. The prosecution introduced evidence of a conversation between the informant and Roviaro that occurred at the time of the alleged

sale, and refused to disclose the identity of the informer. The informant was the sole participant in the alleged transaction other than the defendant and had previously agreed with police to buy narcotics from the defendant. In reversing Roviaro's conviction, the Court relied upon the unfairness of nondisclosure where "the Government's informer was the sole participant, other than the accused, in the transaction charged ... [and] was the only witness in a position to amplify or contradict the testimony of government witnesses." *Id.* at 64, 77 S.Ct. at 630.

The Supreme Court further considered the disclosure problem in *Rugendorf v. United States,* 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964). In *Rugendorf* the search warrant affidavit showed that the informant had knowledge that stolen goods were lodged in the defendant's basement. His information, however, only related to a time a week or so prior to the indictment date. The Court affirmed Rugendorf's conviction despite nondisclosure of an informant's identity, due to defendant's failure to make a timely request for disclosure. The Court distinguished *Roviaro,* however, by pointing out that in *Rugendorf* there was no intimation that the informant "had played a direct and prominent part, as the sole participant with the accused, in the very offense for which the latter was convicted." *Id.* at 534, 84 S.Ct. at 829. It was in fact unclear in *Rugendorf* whether the informant had participated in the alleged crime at all.

The Court of Appeals for the First Circuit has dealt with the nondisclosure of an informant where the record revealed that he was not an actual participant in or witness to the commission of the offense in *United States v. Estrella,* 567 F.2d 1151 (1st Cir.1977). The Court in *Estrella* did not require disclosure stating:

In assessing whether an assertion of the privilege was proper in a given case, courts have emphasized that mere speculation as to the usefulness of the informant's testimony to the defendant is insufficient to justify disclosure of his iden-

tity ... The defendant must indicate some concrete circumstances that might justify overcoming both the public interest in encouraging the flow of information, see *Roviaro, supra,* and the informant's private interest in his own safety....

The defendant manifestly has failed to meet his burden here. The informant neither dealt directly with [the defendant] in any manner, ... nor was he a significant participant in the criminal events.

An examination of the facts of the instant case disclose no legitimate basis for a conclusion that the defendants were entitled to learn the identity of the Government's confidential source.

The informant was not a participant or witness to the offenses charged, and had been ruled incompetent to testify by the trial court as the testimony was hearsay. The government did not make mention of the informant in its case in chief, nor did it make any use of the information provided by the informant because he proved unreliable. The informant identified another bank as the subject of Cream's conversation with him, and the informant's statement gave no indication that the Magnolia bank was discussed by Cream. The evidence in the case clearly showed that the informant and/or Cream were talking about another bank, because Cream was in Florida during the Magnolia robbery, and because the weight of the evidence was that one of the Magnolia robbers was over 6'2". (Hemmer is 6'4" and Cream was 5'9".)

■ In the instant case the confidential source was a "tipster" in that he provided the FBI and police with information. In cases involving the "tipster" type of informant, who merely conveys information to the government but neither witnesses nor participates in the offense, courts generally hold that disclosure is not material and therefore not required. *Johnson v. Wyrick,* 653 F.2d 1234, 1239 (8th Cir.1981); *United States v. House,* 604 F.2d 1135, 1140 (8th Cir.1979), *cert. denied,* 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980).

In *United States v. Halbert,* 668 F.2d 489 (10th Cir.), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 453 (1982) both the district court and the Court of Appeals held that disclosure was not required by *Roviaro.* In that case the informant had heard on the street that one Cox was involved in a robbery. The informant communicated this to an agent who proceeded on it as an investigative lead. Since the informant did not mention the defendant as well as Cox, the defendant urged disclosure claiming the information was exculpatory. The trial court denied this motion. Likewise, in the case at bar, it is not appropriate for the Court to order disclosure. The defendants' reliance on *United States v. Opager,* 589 F.2d 799 (5th Cir.1979) is misplaced. In *Opager* the government had already provided the informant's name, who was a critical government witness, but would not provide an address. Here, the informant was neither a government witness nor even a potential defense witness.

In summary, to allow disclosure in the present case, where the informant's information would not be admissible at trial and is merely speculative, would be inconsistent with the balancing test of *Roviaro.* Accordingly, I rule that the government was not required to and should not have been ordered to disclose the name of the confidential informant in this case.

### VI. *The Alleged Statements Made by Cream to the Informant Concerning a Bank Robbery*

■ The defendants' argument that the identity of the informant should have been provided because he could have been a witness testifying about the purported exculpatory statements made by Cream is equally meritless. The statements were not admissible under Rule 804(b)(3), Fed.R.Evid. Although the declarations to the FBI might have been against the declarant's penal interest, the surrounding circumstances totally failed to indicate the trustworthiness of the statement.

The admission or exclusion of purportedly exculpatory declarations against interest under Rule 804(b)(3) lies within the discretion of the trial court. *See United States v. Guillette,* 547 F.2d 743, 753–55 (2d Cir.1976). Here, there were no corroborating circumstances that clearly indicated the trustworthiness of the statement. As the Court of Appeals for the First Circuit stated:

> First we would not read the standard of trustworthiness as imposing a standard so strict as to be utterly unrealistic.... On the other hand, there is no question but that Congress meant to preclude reception of exculpatory hearsay statements against penal interest unless accompanied by circumstances solidly indicating trustworthiness. This requirement goes beyond minimal corroboration. Trial judges will have to make an assessment case by case ....

*United States v. Barrett,* 539 F.2d 244, 253 (1st Cir.1976). The Court of Appeals for the First Circuit has, as recently as April 5, 1983, reaffirmed the position it took as to the requirements for trustworthiness in *Barrett, supra,* in *United States v. Zirpolo,* (1983), 704 F.2d 23.

In the present case the circumstances do not indicate trustworthiness but tend to show Cream was referring to a different robbery. The informant attributes the statement to different individuals within one day's time. On a visit to Gloucester with FBI agents the informant pointed out the Cape Ann bank as the subject of Cream's conversation. Hence, Cream never identified to the informant the Magnolia bank as the bank he said he robbed, but identified the Cape Ann bank to Bunnsie. The evidence at trial was clear that one of the robbers was well over six feet tall. Neither Cream, Ruta nor McKay, whom Cream told the informant jointly robbed a bank, approached that height, all being well under 6′ tall. All available information, as well as the trial testimony, indicated that Cream was in Florida when the bank was robbed. The testimony at trial that Hemmer was one of the robbers was strong. The informant was never shown to be reliable but was utilized solely for the purpose of providing a possible lead that proved

fruitless. The evidence was that the three robbers ran back to Gloucester after leaving the bank, and there was no evidence that anyone was outside in a car as mentioned by Cream to the informant.

In the case of *United States v. Guillette, supra,* the trial court refused to admit the testimony of a government informant that he had been told by one Anthony Souca that he was the one who had committed the crime the defendant was charged with. Indeed, the Court refused to order the government to turn over the informant's name. Souca could not be located and so was unavailable. The Court of Appeals for the Second Circuit found that the trial court had not abused its discretion since sufficient corroborating evidence did not exist to indicate the trustworthiness of Souca's statements. The Court relied upon the reasoning of *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), which set forth criteria to be considered in determining the trustworthiness of alleged third party confessions. The Court in *Guillette* concluded that Souca's account lacked any significant corroborating evidence and thus upheld the trial court's finding that the informant's statement should not have been admitted nor the identity of the informant revealed. The defendants' in the case at bar claim that despite the strictures of Rule 804(b)(3) the statement should have been admitted pursuant to *Chambers.* The Court of Appeals for the First Circuit in *Barrett, supra,* pointed out that *Chambers* supplements Rule 804(b)(3) and merely holds that it is a violation of due process to exclude such exculpatory evidence as a well corroborated confession of another to the crime for which the accused is on trial. That is not the case here.

Accordingly, I rule that the alleged statements made by Cream to the informant were inadmissible under Fed.R.Evid. 804(b)(3).

### VII. *Adequacy of Evidence*

Finally, defendant Randazza has filed a motion for a judgment of acquittal notwith-

standing the verdict. He argues that Rosemary Lovasco's grand jury testimony should not have been presented to the jury and that without that evidence, the jury would have had insufficient evidence to convict him. Defendant bases this contention on the claim that Lovasco was not properly informed of her Fifth Amendment privilege against self-incrimination before the grand jury and therefore, her testimony should not have been admitted against Randazza.

 I rule that there is no merit in defendant's contention. I find that Lovasco was properly warned of her Fifth Amendment privileges against self-incrimination through an "Advice of Rights" form, the contents of which she stated she understood. I rule that the witness was, therefore, adequately informed of her rights.

 Furthermore, the Fifth Amendment privilege is personal to the person invoking it. *Rogers v. United States,* 340 U.S. 367, 371, 71 S.Ct. 438, 440–41, 95 L.Ed. 344 (1951); *Bowman v. United States,* 350 F.2d 913, 915–916 (9th Cir.1965); *United States v. O'Neill,* 619 F.2d 222, 226 (3d Cir.1980). Thus, even if any inadequacies existed in the warnings given to Lovasco, those infirmities cannot be later asserted by the defendant Randazza as a basis for suppressing Lovasco's testimony.

Lovasco's grand jury statements were properly admitted to the jury, as substantive evidence, for the truth of their contents. See, *United States v. Coran,* 589 F.2d 70, 77 (1st Cir.1978) and accordingly the Court rules that there was an adequate basis for the jury's verdict of guilty as to Randazza.

Order accordingly.