729 F.2d 10
 15 Fed. R. Evid. Serv. 456
 UNITED STATES of America, Appellee,
v.
James HEMMER, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
John CUSICK, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Thomas RANDAZZA, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Michael MARINO, Defendant, Appellant.
 Nos. 83-1329 to 83-1331, 83-1375.
 United States Court of Appeals,
First Circuit.
 Argued Dec. 8, 1983.
Decided March 1, 1984.
 
 Kim Giampietro, Malden, for James Hemmer and Michael Marino.
 Nelson S. Baker, Boston, for Thomas Randazza.
 Richard C. Chambers, Everett, for John Cusick.
 Alfred Paul Farese, Everett, on brief for James Hemmer, John Cusick and Michael Marino.
 Paul F. Healy, Jr., Asst. U.S. Atty., Boston, with whom William F. Weld, U.S. Atty., Boston, was on brief, for appellee.
 Before COFFIN and BREYER, Circuit Judges, and MALETZ,* Senior Judge.
 MALETZ, Senior Judge.
 Defendants-appellants James Hemmer, John Cusick, Michael Marino and Thomas Randazza were indicted for armed bank robbery and conspiracy to rob a national bank in violation of 18 U.S.C. Secs. 2113(d), 2 and 371 (1976), respectively. Defendant Marino was also charged with receipt, possession and concealment of stolen money in violation of 18 U.S.C. Sec. 2113(c). The district court directed a verdict of not guilty for Marino on the robbery and conspiracy counts. The jury found Marino guilty of the possession offense, and his three codefendants guilty as charged.
 On appeal, defendants contend that their defense was prejudiced by the government's failure to disclose in a timely manner certain items of purportedly exculpatory evidence; that the district court erred in not ordering disclosure of the identity of a government informant; and that the testimony of a government witness should have been stricken because it was allegedly untrustworthy. In addition, defendant Randazza contends that he should have been tried as a juvenile, rather than as an adult, pursuant to the Juvenile Justice and Delinquency Prevention Act, 18 U.S.C. Secs. 5031-5042 (1976). He further submits that the evidence was insufficient to sustain his conviction.
 
 
 1
 For the reasons that follow, we affirm the judgment of the district court.
 
 I.
 
 2
 On the evening of January 30, 1981, at approximately 7:00 p.m., three males wearing ski masks and armed with a knife and gun entered the First National Bank of Ipswich, located in Magnolia, Massachusetts. They announced a robbery and ordered the two tellers, the bank manager and a 13-year-old customer to lie on the floor. These individuals were told that if they moved they would be shot. After ordering the bank manager to open the bank vault one of the robbers took nearly $70,000. As they were locking the four individuals in the vault, one of the robbers commented to his accomplices in reference to the young boy, "Don't hurt him, he's cool." Defendant Randazza is related to the 13-year-old. The three robbers made their getaway on foot through a snow-covered woods. Footprints made by sneakers and workboots were discovered by the police, who took photographs of the impressions.
 
 
 3
 Earlier on the day of the robbery all four defendants were present at Marino's Gloucester, Massachusetts, home. That night Marino hosted a party. Cusick and Randazza arrived at around 9:00 p.m. When one of the guests asked Cusick if he had committed the robbery, he gave no reply, and to another person he replied sarcastically, "Yes, right." The following day Gordon Anderson, an occupant of Marino's home, saw Marino counting money in one of the bedrooms. Marino told Anderson that the money had come from the bank robbery. The next day all four defendants were present at the Marino home when a fifth individual, Eric Aiken, entered, demanding a cut of the take from the robbery.
 
 
 4
 Approximately a week after the robbery defendant Hemmer went to Florida to visit a friend, George Cream. One of the occupants of Cream's home observed Hemmer with a 3" to 6" stack of money in front of him which he furtively placed in a bag when he realized he was being watched. Hemmer was also overheard saying something about a knife and gun, that $5,000 had to be thrown away, and that "we did a good score."
 
 
 5
 Against this background we turn to the three areas in which defendants assign substantial error, beginning with the issue of disclosure of allegedly exculpatory evidence.
 
 II.
 
 6
 In its investigation of the bank robbery the FBI did fingerprint and handwriting analyses and a footprint comparison. The fingerprint analysis involved testing certain bills which had been traced to the bank for defendants' fingerprints (Marino's fingerprints were not submitted for analysis). The test results were negative. The handwriting analysis positively compared George Cream's handwriting with that appearing on an atlas seized from his Gloucester, Massachusetts, residence in November, 1980.[1] The relevancy of the atlas was that it contained a map of Gloucester which had markings indicating routes leading to and from the First National Bank of Ipswich. Also in the atlas was a sketch showing the interior layout of that bank. The third report described a comparison of photographs taken of the footprints left in the snow with a pair of sneakers seized from Hemmer. That comparison proved negative.
 
 
 7
 The footprint and fingerprint reports were not turned over to defendants until the government presented its case in chief. The prosecutor was apparently unaware of the existence of these two reports until he learned of them during his direct examination of an FBI agent. The handwriting report had been given to Hemmer and Randazza at least four months prior to trial, but for some inexplicable reason--whether through inadvertence or otherwise is not clear--it had not been provided to Marino or Cusick until the day of trial. Once all three reports were made available to defendants they utilized them on cross-examination. No continuances were requested by any of the defendants.
 
 
 8
 Defendants contend in essence that the government violated pre-trial discovery orders by failing to produce the three reports in advance of trial. For that reason, they maintain, their convictions should be reversed based on deliberate prosecutorial misconduct.
 
 
 9
 In ruling on defendants' motions for dismissal, mistrial, and judgment notwithstanding the verdict, the district court found no bad faith or other willful misconduct on the part of the assistant United States attorney who represented the government at trial. United States v. Hemmer, 561 F.Supp. 386, 388-89 (D.Mass.1983). To the contrary, the delay in producing these reports was apparently due to the negligence of the FBI case agent. Id. at 389. The district court found that despite the late disclosure defendants had not been prejudiced in any way, particularly in view of the fact that they did receive the reports during the course of the trial and used them in their defense. Id. at 389-90.
 
 
 10
 In order to succeed on a claimed violation of rule 16 of the Federal Rules of Criminal Procedure,[2] a defendant must demonstrate that he has been prejudiced. Furlow v. United States, 644 F.2d 764, 767 (9th Cir.), cert. denied, 454 U.S. 871, 102 S.Ct. 340, 70 L.Ed.2d 175 (1981); United States v. Glaze, 643 F.2d 549, 552 (8th Cir.1981); United States v. DeWeese, 632 F.2d 1267, 1272 (5th Cir.1980), cert. denied, 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 188 (1981). Based on our own review of the record, we have found no prejudice sufficient to warrant the extraordinary relief of dismissal. See United States v. Richman, 600 F.2d 286, 292 (1st Cir.1979) ("No deliberate wrongdoing by the government or prejudice to the defendants was evidenced. The district court has discretion in handling noncompliance with discovery orders and the manner chosen by the court here was not an abuse of that discretion."). See also United States v. Gladney, 563 F.2d 491, 493-94 (1st Cir.1977). Defendants here did receive the results of the two analyses and the one comparison and utilized them all at trial. It has not been shown that any defense strategy was altered by the late disclosure. Nor does it appear that timely disclosure would have resulted in a different defense strategy. Significantly, there was no request for a continuance either to digest the reports or to prepare a new defense. Cf. Gladney, 563 F.2d at 494 (claim of prejudice undercut by defendant's refusal of continuance).
 
 
 11
 While we do not condone non-disclosure of readily available, relevant material in the government's hands, neither do we believe that the prosecutor is to blame here. More importantly, "[t]he district court was entitled to conclude that the government's conduct fell short of being so flagrant as to warrant a mistrial regardless of prejudice ...." United States v. Principe, 499 F.2d 1135, 1139 (1st Cir.1974).
 
 
 12
 Insofar as defendants argue that this material was exculpatory in nature and therefore producible prior to trial under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the perimeters of their Brady argument are not entirely clear from their brief. Indeed, defendants have not demonstrated what Brady material the reports contained or how earlier disclosure would have aided their defense. The fact that defendants had the reports and used them at trial, coupled with an absence of any showing of prejudice, undermines whatever Brady claim they may have. United States v. Smith, 609 F.2d 1294, 1302-03 (9th Cir.1979); United States v. Ziperstein, 601 F.2d 281, 291 (7th Cir.1979) ("As long as ultimate disclosure is made before it is too late for the defendants to make use of any benefits of the evidence, Due Process is satisfied"), cert. denied, 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980).
 
 
 13
 What is more, a defendant, in order to succeed on a Brady claim, must show that the evidence was exculpatory, as measured by its materiality. A threshold inquiry in this context is whether the discovery request was specific or general. Defendants insist that they made a specific request for discovery. However, their requests did not point with any particularity to the evidence desired. See United States v. DiCarlo, 575 F.2d 952, 958-60 (1st Cir.), cert. denied, 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed.2d 129 (1978). In addition, one of the motions which they claim was specific in nature was a motion for preservation of evidence, not a request for discovery of Brady material. Consequently, since defendants made only a general discovery request for exculpatory information, in order to be "material" under Brady it must be "obviously exculpatory in nature", United States v. Ferreira, 625 F.2d 1030, 1033-34 (1st Cir.1980); that is, "of sufficient significance to result in the denial of the defendant's right to a fair trial." United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). See United States v. Imbruglia, 617 F.2d 1, 5 (1st Cir.1980). We do not believe that the reports in question meet these criteria.
 
 
 14
 Starting with the handwriting report, that report concluded that George Cream, an unindicted co-conspirator, wrote various items on an atlas seized by police during a search of his home. Hemmer was living with Cream at the time. These facts were consistent with the government's theory of the case--that Cream was involved in the conspiracy and planning stages of the robbery, and harbored Hemmer afterwards. Since Hemmer and Randazza were both provided with this report in advance of trial, only Cusick and Marino have any arguable basis for complaining. However, the government never contended other than that the atlas was Cream's, as indicated in the conspiracy charge of the indictment. Its existence was in no wise exculpatory of Cusick, and certainly not of Marino who was acquitted of both the conspiracy and robbery charges.
 
 
 15
 As for the footprint analysis, it is undisputed that it was only Hemmer's sneakers which were compared to the photographs taken of the footprints in the snow. However, there is no evidence that the tall robber brandishing the knife--purportedly Hemmer--wore sneakers during the robbery. At most the footprint analysis was an investigative lead developed by the FBI which bore no fruit.
 
 
 16
 Nor was the fingerprint report exculpatory of defendants. The fact that certain bills traced to the bank did not bear their fingerprints does not necessarily mean that defendants did not touch the bills. Moreover, it was shown at trial that the robbers wore gloves during the holdup. If they were so conscious of fingerprints during the robbery, it is not unreasonable to conclude that they were similarly cautious in handling the money afterwards.
 
 
 17
 Having found no reversible error on this phase of defendants' appeal, we next consider whether the district court should have required disclosure of a government informant's identity, as well as admitted his hearsay statements into evidence.
 
 III.
 
 18
 During the government's direct case it was learned by all counsel that in April, 1981, the FBI and the Gloucester police had interviewed a potential source of information, identified only as "Bunnsie." This informant told the authorities that George Cream and two others had robbed a Gloucester bank, although the specific bank was not identified. It was Cream who supposedly told Bunnsie this story. Defendants sought to introduce this statement and to obtain the informant's full name and address. The district court ruled that the informant's statement was inadmissible hearsay, and that in any event his identity would not be disclosed since he was neither an actual participant in nor witness to the commission of the offense. 561 F.Supp. at 392. We agree.
 
 
 19
 The law recognizes a qualified governmental privilege to withhold the identity of a person who furnishes information of law violations to law enforcement personnel. See Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); Scher v. United States, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151 (1939). See also Souza v. Ellerthorpe, 712 F.2d 1529 (1st Cir.1983). This court, in United States v. Estrella, 567 F.2d 1151 (1st Cir.1977), addressed itself specifically to the question of disclosing an informant's identity where, as here, he was not an actual participant in or witness to the crime:
 
 
 20
 In assessing whether an assertion of the privilege was proper in a given case, courts have emphasized that mere speculation as to the usefulness of the informant's testimony to the defendant is insufficient to justify disclosure of his identity.... The defendant must indicate some concrete circumstances that might justify overcoming both the public interest in encouraging the flow of information, see Roviaro, supra, and the informant's private interest in his own safety.
 
 
 21
 [The defendant] manifestly has failed to meet his burden here. The informant neither dealt directly with [the defendant] in any manner, ... nor was he a significant participant in the criminal events.
 
 
 22
 Id. at 1153. We find Estrella controlling.
 
 
 23
 First, Bunnsie was not a witness or participant in the crime, but rather was a "tipster." See Johnson v. Wyrick, 653 F.2d 1234, 1239 (8th Cir.1981); United States v. Barnes, 486 F.2d 776, 778 n. 3 (8th Cir.1973) ("In cases involving the 'tipster' type of informant, who merely conveys information to the government but neither witnesses nor participates in the offense, courts generally hold that disclosure is not material and therefore not required."). In addition, the government did not mention him in its case in chief, nor did it use the information he provided. As for the usefulness of Bunnsie's testimony, the district court concluded, and the record reflects, that Cream must have been talking about a bank other than the First National Bank of Ipswich since Cream was in Florida at the time the Ipswich bank was robbed. 561 F.Supp. at 393.
 
 
 24
 Given these considerations, we believe the district court acted properly in not requiring disclosure. While we recognize that disclosure may be necessary where the informant may give testimony which is helpful to the defense, see United States v. Halbert, 668 F.2d 489, 496 (10th Cir.), cert. denied, 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 453 (1982), here the information Bunnsie provided was of no use whatsoever.
 
 
 25
 Turning then to the question of the admissibility of Bunnsie's statement, defendants initially contended that the informant's identity should have been provided because he arguably was a witness who could testify to purportedly exculpatory statements. See Fed.R.Evid. 804(b)(3). Alternatively, since neither Bunnsie nor Cream was available to testify--Bunnsie's then present whereabouts being unknown (even had his identity been disclosed) and Cream being deceased at the time of trial--this compounded hearsay statement would still be admissible as a declaration against penal interest. See Fed.R.Evid. 804(a)(5) and (b)(3). Even so, defendants' argument fails in the face of the district court's conclusion, with which we concur, that the statement was untrustworthy. 561 F.Supp. at 393. See Fed.R.Evid. 804(b)(3) ("A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement [emphasis added].").
 
 
 26
 The district court found no corroborating circumstances clearly indicating the trustworthiness of Cream's statement to Bunnsie. In assessing the district court's conclusion we are guided by this court's decision in United States v. Barrett, 539 F.2d 244 (1st Cir.1976):
 
 
 27
 First we would not read the standard of trustworthiness as imposing a standard so strict as to be utterly unrealistic.... On the other hand, there is no question but that Congress meant to preclude reception of exculpatory hearsay statements against penal interest unless accompanied by circumstances solidly indicating trustworthiness. This requirement goes beyond minimal corroboration. Trial judges will have to make an assessment case by case .... In cases that are open to reasonable differences, this court is unlikely to substitute its judgment for that of the district court.
 
 
 28
 Id. at 253. Accord United States v. Zirpolo, 704 F.2d 23, 26-27 (1st Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 87, 78 L.Ed.2d 96 (1983). Not only is there no evidence corroborating Cream's statement, there is, on the contrary, evidence indicating it might well be untrustworthy. The district court found, first, that Bunnsie had attributed the purportedly exculpatory statement to two different individuals within one day's time. The court also found that Cream was referring to a different robbery--he never identified the First National Bank of Ipswich as the bank he said he robbed, but rather identified the Cape Ann Bank of Gloucester to Bunnsie as the target of a robbery. In fact, on a visit to Gloucester with FBI agents the informant pointed out the Cape Ann Bank as the subject of Cream's conversation. All available information further indicated that Cream was in Florida when the Ipswich bank was robbed. Moreover, the evidence at trial is clear that one of the robbers of the Ipswich bank was well over six feet tall (Hemmer is 6'4"'). Neither Cream nor the two accomplices whom Cream said robbed a bank approached that height, all being well under six feet. See 561 F.Supp. at 393.
 
 
 29
 In sum, the entire record argues against the trustworthiness of Cream's statement.[3] Accordingly, we are not prepared to substitute our judgment for that of the district court in this regard. Barrett, 539 F.2d at 253.
 
 
 30
 We turn then to defendants' last contention--that the testimony of Rosemary Lovasco, a government witness, should have been stricken because of its alleged untrustworthiness.
 
 IV.
 
 31
 Defendants argue that the grand jury testimony of Rosemary Lovasco, a girlfriend of defendant Randazza, was inherently untruthful and that, for that reason, the government's use of that testimony at trial as substantive evidence resulted in a denial of due process. We find their contention meritless.
 
 
 32
 As reflected in her testimony before the grand jury, Randazza had briefed Lovasco in some detail on the robbery, inculpating himself and his co-defendants in that offense. During the government's examination of Lovasco in its direct case, however, she experienced memory lapses and gave testimony inconsistent with and contradictory to her grand jury testimony. The government thereupon offered her grand jury testimony as substantive evidence.
 
 
 33
 Defendants' characterization of Lovasco's grand jury testimony as perjurious necessarily invites the converse conclusion--that her trial testimony was truthful. But this does not follow any more than that Lovasco's testimony at trial was untrue merely because it was at variance with her grand jury testimony. On this score, the district court quite correctly concluded that the jury was the appropriate arbiter of the truth, the body best suited for sifting falsehoods from facts. Simply because there existed inconsistencies between Lovasco's grand jury and trial testimony does not warrant the inference that the government knowingly introduced perjurious testimony. United States v. Holladay, 566 F.2d 1018, 1019 (5th Cir.) ("Presentation of a witness who recants or contradicts his prior testimony is not to be confused with eliciting perjury. It was for the jury to decide whether or not to credit the witness"), cert. denied, 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978). And as noted by the Supreme Court, "the credibility of ... testimony [is] to be determined by a properly instructed jury." Hoffa v. United States, 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966).
 
 
 34
 In short, Lovasco's grand jury testimony was admissible as substantive evidence. United States v. Coran, 589 F.2d 70, 76 (1st Cir.1978); Fed.R.Evid. 801(d)(1)(A). It was for the jury to decide whether or not to credit it.
 
 V.
 
 35
 We consider, finally, the two issues which defendant Randazza raises. First, he argues that the evidence was insufficient to convict him. However, not only was there testimony by his girlfriend directly implicating him in the robbery, there was also the testimony of eyewitnesses to the robbery which fully corroborated Lovasco's grand jury versions of that offense as described to her by Randazza; the testimony of another witness placing Randazza with Cusick and Marino one hour before the robbery, one hour after, and together again two days later; and the statement at the bank by one of the robbers not to hurt the 13-year-old boy, the latter being a relative of Randazza. Based on the evidence taken as a whole, the jury could have found guilt beyond a reasonable doubt. United States v. Hensel, 699 F.2d 18, 33 (1st Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983).
 
 
 36
 Randazza also contends that he should have been tried as a juvenile. He does not argue, however, that the district court failed to consider all six statutory factors set out in the Juvenile Justice and Delinquency Prevention Act, 18 U.S.C. Secs. 5031-5042.[4] Instead, he suggests that the district court did not give due weight to the peculiarities of his case as measured against those six factors. We note, however, that it is within the district court's reasoned discretion as to what weight to assign each factor. United States v. Alexander, 695 F.2d 398, 401 (9th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 2458, 77 L.Ed.2d 1337 (1983). Furthermore, the guiding principle in transfer proceedings is "whether a transfer would be in the interest of justice." 18 U.S.C. Sec. 5032. Such a determination is likewise left to the sound discretion of the district court. United States v. Hayes, 590 F.2d 309, 311 (9th Cir.1979).
 
 
 37
 In light of the gravity of the crime involved, weighed against the other five section 5032 factors, we cannot say that the district court struck the balance improperly.
 
 
 38
 Affirmed.
 
 
 
 *
 Of the United States Court of International Trade, sitting by designation
 
 
 [1]
 Hemmer was present in Cream's home at the time of the search and seizure
 
 
 [2]
 Fed.R.Crim.P. 16 provides in part:
 (a) Disclosure of Evidence by the Government.
 (1) Information Subject to Disclosure.
 * * *
 (d) Reports of Examinations and Tests. Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.
 
 
 [3]
 Assuming this statement was Brady material, as defendants contend, it was nevertheless inadmissible. Thus, even had it been disclosed prior to trial it could not have affected the outcome. See United States v. Agurs, 427 U.S. 97, 109-10, 96 S.Ct. 2392, 2400-01, 49 L.Ed.2d 342 (1976). See also Smith v. Phillips, 455 U.S. 209, 220 n. 10, 102 S.Ct. 940, 947 n. 10, 71 L.Ed.2d 78 (1982) ("Even in cases of egregious prosecutorial misconduct, ... the misconduct's effect on the trial, not the blameworthiness of the prosecutor, is the crucial inquiry for due process purposes.")
 
 
 [4]
 18 U.S.C. Sec. 5032 sets forth the six factors:
 Evidence of the following factors shall be considered, and findings with regard to each factor shall be made in the record, in assessing whether a transfer would be in the interest of justice: the age and social background of the juvenile; the nature of the alleged offense; the extent and nature of the juvenile's prior delinquency record; the juvenile's present intellectual development and psychological maturity; the nature of past treatment efforts and the juvenile's response to such efforts; the availability of programs designed to treat the juvenile's behavioral problems.