**STATE of Minnesota, Respondent**

v.

**Tony M. CAINE, Appellant.**

**No. A07–176.**

Supreme Court of Minnesota.

March 27, 2008.

John M. Stuart, State Public Defender, Michael F. Cromett, Asst. State Public Defender, St. Paul, MN, for appellant.

Michael O. Freeman, Hennepin County Atty., Donna J. Wolfson, Asst. County Atty., Minneapolis, MN, Lori Swanson, Atty. Gen., St. Paul, MN, for respondent.

## O P I N I O N

ANDERSON, PAUL H., Justice.

A Hennepin County jury found Tony M. Caine guilty of first-degree intentional felony murder, second-degree intentional murder, and second-degree unintentional felony murder for the death of Brandon

Lynch. The Hennepin County District Court convicted Caine of first-degree intentional murder. Caine appeals on five grounds. First, Caine argues that the district court committed numerous errors when it admitted an alleged accomplice's guilty plea transcript under Minn. R. Evid. 801(d)(1)(A). Second, Caine claims that there was insufficient evidence for the jury to find, beyond a reasonable doubt, that he was not under duress when he killed Lynch. Third, Caine argues that the court erred when it failed to instruct the jury that the State has the burden of disproving duress beyond a reasonable doubt. Fourth, Caine claims the court erred when it denied his request for a jury instruction on first-degree manslaughter under Minn. Stat. § 609.20(3) (2006). Finally, Caine claims that several acts of prosecutorial misconduct prejudiced him and that this misconduct warrants a new trial. We affirm.

In 2004, appellant, Tony M. Caine, was residing in Chicago with his mother and his son. While Caine was in Chicago, his cousins, Mario Davis and Kevin Reese, called him and told him they had stolen "a lot of weapons." They also mentioned that Jermaine Jackson and Brandon Lynch had participated in the weapons theft. After Thanksgiving, 2004, Caine traveled to Minneapolis with his son so his son could spend the holidays with his mother, Lola Martina Medved.

Medved testified that on December 19, 2004, she woke up to find Caine, Reese, and Davis in her house. Caine, however, testified that only he and Reese were in the house. Reese and Caine took Medved's car and drove to the Glenwood area of Minneapolis where Reese proceeded to sell some drugs. According to Caine, this is when Davis joined them. While the three men were still in the Glenwood neighborhood, Jackson and Lynch pulled up in a maroon van. There was a conversation about Jackson and Lynch exchanging marijuana for an assault rifle that Reese had in his possession as the result of the earlier weapons theft. The men agreed to meet at Jackson's house later in the afternoon to make the exchange. Both Caine and Jackson testified that Caine was not a part of this discussion. Jackson and Lynch then left. Reese, Caine, and Davis returned to Medved's house where Reese brought the assault rifle out of the house and placed it in the trunk of Medved's car. The three men then drove to Jackson's house in North Minneapolis.

When Caine, Reese, and Davis pulled up to Jackson's house, Reese telephoned Jackson to say they had arrived. Shortly thereafter, Jackson and Lynch arrived at the house and went inside. Jackson's mother was at home and in the kitchen at the time. Jackson then came out of the house and invited Reese and Davis inside while Caine remained in the car. Jackson testified that Lynch stayed outside with Caine, but Caine stated he did not see Lynch at that time. Inside the house, Reese, Jackson, and Davis went into Jackson's bedroom to talk about the exchange. Caine testified that Lynch later came outside and asked for the assault rifle, which Lynch then took from the trunk of the car. Lynch and Caine then went into the house. Lynch carried the rifle wrapped in a blanket and Caine walked behind him. Once inside the house, Caine and Lynch passed by Jackson's mother, who first asked Lynch what was inside the blanket and then said it looked like a gun. Lynch and Caine joined Jackson, Reese, and Davis in Jackson's bedroom, and Jackson unwrapped the rifle and placed it under his mattress. The two pounds of marijuana meant for the trade were on Jackson's bed.

At trial, the State called Jackson, Davis, a medical examiner, and a police officer to

testify about the events that transpired in Jackson's room that led to Lynch's death. During the defense's case-in-chief, Caine called an investigator and testified on his own behalf. While to a large degree the witnesses' testimony about what transpired during the exchange in Jackson's bedroom was consistent, the testimony varied on some key details.

*Jackson's testimony*

Jackson testified that when all five men were in the bedroom, Caine was standing in the doorway while Jackson, Lynch, Reese, and Davis were inside the room. Jackson said that he argued with Lynch about bringing the assault rifle into the house. At that point, Reese picked up a gun that was sitting on Jackson's television set and put the "gun in [Jackson's] face." Jackson stated that he then heard a shotgun being cocked back and when he turned around to look he saw Caine "waving [a shotgun] around like guarding the door." Reese, gun in hand, then threatened Jackson and Lynch, saying, "I'll kill all you * * *," and told Jackson and Lynch to get on the floor. Reese then told Davis to check Lynch's pockets. Davis patted Lynch down and took a gun and some money while Reese asked Jackson where the rest of the marijuana was. Jackson stated that while these events took place, Caine was still standing in the doorway pointing the shotgun at him and Lynch. Davis, with the gun and money he took from Lynch, then took the assault rifle and the marijuana meant for the exchange and left the room.

Reese, while still pointing the gun at Jackson and Lynch, told them that if he ever saw them in the streets again, he would kill them. As he was leaving the room, Reese told Caine to "shoot," but Caine hesitated. At that point, Jackson threw the television at Caine and Caine backed up into the doorway. Lynch jumped up from the floor in an attempt to close the door. At the same time, Jackson saw Reese standing behind Caine, "tapping [Caine] on the shoulder." Jackson then heard Reese again telling Caine to "shoot ['e]m." Within seconds, Jackson saw the shotgun come through the doorway and heard a shot. Reese and Caine then ran off. After seeing that Lynch had been shot and "wasn't doing too well," Jackson went to find his mother and called the police.

*Caine's testimony*

Caine testified that when all five men were in Jackson's bedroom, Lynch pulled a gun out of his pants. When Lynch put the gun back, Reese grabbed a gun that was on top of Jackson's television. Reese, waving the gun around, told everyone to get down. Caine said that he thought he was going to get shot, so he jumped onto the bed. Reese told Davis to take Lynch's gun. Davis took the gun and the marijuana and ran out of the room. Reese began threatening to "kill everybody."

Caine testified that Reese told him to pick up a shotgun that was lying on the floor and to "act like [he knew] how to use it." Caine picked up the shotgun and "acted like [he knew] how to use it" by pumping it. Reese then told Caine, "Time to get the cherry busted and shoot," which Caine understood to mean that he should kill somebody for the first time. Caine testified that he did not want to shoot anyone, so he started backing out of the room. At that point, a television flew at Caine and he jumped back, "in the hallway kind of." Caine said that as he moved backward, he was stopped by Reese, who had his hand on Caine's shoulder and a gun pointed at the back of Caine's head. According to Caine, Reese once again told him to shoot. Caine said that he then closed his eyes and pulled the trigger. Caine testified that after the television

flew at him, Lynch had jumped up, and he guessed that Lynch must have jumped in front of him because Lynch was shot.

Caine testified that after he shot Lynch, Reese grabbed Caine by the collar and threw him back, saying, "run, run." Caine ran out of the house with the shotgun in his hand. Caine said that he, Reese, and Davis then drove back to Medved's house. At the house, Caine ran upstairs to wake Medved to tell her what had happened. He told Medved that someone might have been killed. Reese then told Caine that they had to go. Caine, Reese, and Davis got into a cab that Reese had called and went to Prior Lake, where Reese knew some girls. The girls then drove the three men to Chicago. Caine stated that when they stopped at a gas station in Chicago and the others went inside, he took a bag of marijuana, got out of the car, and ran home.

*Medical examiner's testimony*

At trial the State called a medical examiner who testified that a shotgun "slug" killed Lynch. The direction of the slug was front to back in a downward direction, entering Lynch's body in front of his neck, above his sternum. The examiner also displayed to the jury pictures of Lynch's body that showed the position of the gunshot wound almost perfectly centered on Lynch's body, in line with his chin. The examiner stated that the shotgun was shot at very close range, possibly while in contact with Lynch's body. The examiner also stated that the wound was consistent with the shooter standing and Lynch lying down and trying to get up. On cross-examination, the examiner conceded that the shot could have been fired from up to 2 feet away and that the wound was also consistent with Caine's version of the incident.

*Davis's testimony and guilty plea transcript*

Before Caine's trial, Davis pleaded guilty to second-degree murder for his participation in Lynch's shooting. The plea agreement required Davis to testify truthfully against Reese and Caine in return for a downward sentencing departure. During Caine's trial, the State called Davis, but Davis testified that he no longer remembered anything about the day of the incident because he was assaulted in prison and had since lost his memory. The State attempted to refresh Davis's recollection by showing him his guilty plea transcript, but Davis still claimed he had no memory of the incident or the details of the plea agreement. The State, arguing that Davis was feigning memory loss, moved to admit Davis's plea transcript for both substantive and impeachment purposes as a prior inconsistent statement under Minn. R. Evid. 801(d)(1)(A). Caine objected. The district court delayed ruling on the transcript and adjourned for the day. When the trial resumed the next day, the State and Caine both offered arguments concerning the admissibility of the transcript, and the State then completed its direct examination of Davis.

On cross-examination, Caine elicited testimony about why Davis might be lacking memory at trial. Caine asked if the State threatened Davis with more jail time if he did not testify cooperatively. Davis replied affirmatively. Caine's counsel then said, "And that's the reason why you have sort of a lack of memory, because you don't want to get in more trouble, is that a fair statement?" Davis agreed. After the State rested, the district court admitted Davis's guilty plea transcript but granted Caine's request to redact one part of it.

At his plea hearing, Davis had stated that he, Caine, and Reese had decided to rob Lynch of his marijuana. Davis had

also stated that while in Jackson's room he took a gun and marijuana from Lynch and then left; that when he left Caine was waving a gun around; and that after he left the room he heard a shot. The plea hearing transcript also indicates that the State attempted to get Davis to agree that Caine intentionally shot Lynch, but Davis persistently stated that he did not know if the shooting was intentional because he was not in the room.

*Caine's investigator's testimony*

During his case-in-chief, Caine called Fred Anderson, a criminal investigator, to testify about what Davis said during a pretrial interview. Anderson indicated that Davis said Caine did not have a shotgun before entering Jackson's house. Davis also told Anderson about the gun-for-marijuana trade, that Caine wore a short jacket to Jackson's house, and that Davis was not in the bedroom when Caine shot Lynch. Anderson further testified that, based on the prosecutors' statements, Davis "felt like whatever [prison] time he[ ] agreed to do would be in jeopardy if he didn't testify according to" the information in the State's investigation. Anderson also stated that Davis never indicated he was suffering from memory loss or that he had been assaulted in prison. Caine asked Anderson if "Davis mentioned that his fiancee had been threatened by [Caine] if [Davis] were to testify." Anderson said that Davis "kind of laughed and said that didn't happen."

*Police officer's testimony*

During rebuttal, the State called Sergeant Richard Zimmerman, who was present when the State interviewed Davis before trial. Zimmerman testified that during the interview, Davis did not mention any memory problems or any injuries he sustained in prison. Further, Zimmerman testified that neither he nor any prosecutor threatened Davis, although the prosecutors warned Davis of the consequences of perjury at trial. Zimmerman also stated that Davis said the shotgun used to kill Lynch was Caine's and Caine brought it to Jackson's house under a long coat.

When the State asked Zimmerman if Davis mentioned that he was injured in prison, Zimmerman said, "No. He told me he was worried about his girlfriend being threatened by the defendant's family." This answer was stricken from the record as nonresponsive. Later, during questioning regarding whether any prosecutor threatened Davis, the following exchange occurred:

[State]: Did [Davis] mention being threatened by anyone?

[Zimmerman]: No, he didn't, other than the defendant's family threatening his girlfriend.

[State]: And what did you do in response to his mentioning that threat to his girlfriend?

[Zimmerman]: I wrote out my phone number and gave it to [Davis] to have his girlfriend contact me, and we would provide any assistance as far as those threats were related to.

[State]: Was [Davis] concerned about these threats to his girlfriend?

[Zimmerman]: Oh, absolutely.

Caine did not object during this exchange and later cross-examined Zimmerman on other matters.

*Jury instructions and verdict*

At trial, Caine asserted the defense of duress and requested a jury instruction on duress under Minn.Stat. § 609.08 (2006). He also requested an instruction on heat-of-passion first-degree manslaughter under Minn.Stat. § 609.20(1) (2006). Before closing arguments, the district court ruled that it would not give the heat-of-passion

instruction because Caine was claiming the killing was unintentional. At this point, Caine argued for an instruction under Minn.Stat. § 609.20(3) (2006), which defines first-degree manslaughter as "intentionally caus[ing] the death of another person because the actor is coerced by threats made by someone other than the actor's coconspirator." The court declined to give any instruction under section 609.20 but did instruct the jury on duress, in addition to second-degree unintentional felony murder under Minn.Stat. § 609.19, subd. 2(1) (2006); first-degree intentional felony murder under Minn.Stat. § 609.185(a)(3) (2006); and second-degree intentional murder under Minn.Stat. § 609.19, subd. 1(1) (2006). After four hours of deliberations, the jury found Caine guilty of first-degree murder but did not fill out the verdict forms for the three other counts. The district court sent the jury back to deliberate on the remaining counts. After deliberating for approximately 27 minutes, the jury found Caine guilty of all three counts. The court then convicted Caine of first-degree murder.

Caine appeals claiming (1) the district court committed several errors when it admitted Davis's guilty plea transcript; (2) the State failed to prove beyond a reasonable doubt that Caine was not under duress; (3) the court committed reversible error when it failed to instruct the jury that the State's burden to disprove duress is beyond a reasonable doubt; (4) the court erred when it denied Caine's request to instruct the jury on first-degree manslaughter under Minn.Stat. § 609.20(3); and (5) several acts of prosecutorial misconduct merit the grant of a new trial.

## I.

■ Caine argues that the district court committed several reversible errors when it admitted Davis's guilty plea tran-script as a prior inconsistent statement under Minn. R. Evid. 801(d)(1)(A). We will reverse evidentiary rulings only if the district court clearly abused its discretion and the defendant was thereby prejudiced. *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003). This means we will reverse only if there is a reasonable possibility that without the error "the verdict might have been more favorable to the defendant." *State v. Richardson*, 670 N.W.2d 267, 277 (Minn. 2003). If a defendant fails to object to the admission of evidence at trial, we may review the district court's decision if "it implicates a plain error affecting substantial rights." *State v. Anderson*, 733 N.W.2d 128, 134 (Minn.2007); *see State v. Crowsbreast*, 629 N.W.2d 433, 437 (Minn. 2001). Under the plain error doctrine the defendant must first show: (1) error; (2) that was plain; and (3) that affected substantial rights. *Crowsbreast*, 629 N.W.2d at 437. Once plain error affecting substantial rights is shown, we will reverse if the error " 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Id.* (alteration in original) (quoting *Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)).

*Admissibility of Davis's guilty plea transcript under Minn. R. Evid. 801(d)(1)(A)*

■ Caine asserts that because the district court failed to make a finding that Davis was subject to cross-examination about the circumstances of his plea hearing statement and because Davis was not, in fact, subject to cross-examination at trial, admission of Davis's plea testimony under Minn. R. Evid. 801(d)(1)(a) was error. The rules of evidence provide that a prior statement by a person who testifies at trial is admissible as a non-hearsay statement if the prior statement is "inconsistent with the declarant's testimony, and was given

under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." Minn. R. Evid. 801(d)(1)(A). We have stated that when a district court finds that a witness is feigning lack of memory at trial of an incident the witness previously testified about, the feigned memory loss is inconsistent with the witness's prior testimony. *Amos*, 658 N.W.2d at 205–06. We have held that in this situation the court has the discretion to admit the prior testimony as a non-hearsay prior inconsistent statement under Rule 801(d)(1)(A).[1] *Id.* at 204–06 (noting that when a witness is *actually* lacking memory at trial, the witness is deemed unavailable under Minn. R. Evid. 804(a)(3)). But the prior inconsistent statement is admissible only if the witness is present at trial and "subject to cross-examination concerning the [prior] statement." Minn. R. Evid. 801(d)(1); *Amos*, 658 N.W.2d at 206. The witness does not need to remember the events underlying the prior statement, but we have required that the witness "be reasonably responsive to questions on the circumstances in which he made [the prior statement]." *Amos*, 658 N.W.2d at 206.

In *Amos*, a witness testified at her brother's trial concerning facts that incriminated him in a drive-by shooting incident. *Id.* at 203. Two weeks later, at her father's trial for the same incident, the

witness claimed that she remembered nothing from the day of the incident. *Id.* The district court found the witness was feigning memory loss, and the court admitted her testimony from her brother's trial under Minn. R. Evid. 801(d)(1)(A). *Id.* On appeal, we concluded that the witness was subject to cross-examination about her prior testimony because she admitted that she testified at her brother's trial and that she had tried to tell the truth. *Id.* at 206. Further, while the witness claimed she did not remember the basis of her prior testimony, the defendant—her father—had full opportunity to test the prior testimony when he questioned her and was able to elicit some details about the incident that were favorable to him. *Id.*

■ In this case, the district court did not make an explicit finding that Davis was subject to cross-examination at Caine's trial about his prior testimony. But *Amos* does not require that the court expressly make such a finding. Further, Davis was subject to cross-examination concerning the circumstances of his prior statement because like the witness in *Amos*, Davis testified that he remembered pleading guilty to second-degree murder and other facts surrounding the giving of his plea.[2] Davis also testified about certain facts surrounding the underlying incident that were favorable to Caine.[3] Further, Caine elicited testimony from Davis about why Davis

---

1. In *Amos* we looked to federal case law for guidance. We noted that the term "inconsistent statements" covers not only statements that are "diametrically opposed or logically incompatible," but also covers situations where a witness testifies about an incident and later feigns loss of memory. *Amos*, 658 N.W.2d at 204.

2. Davis remembered enough about the plea to dispute the charges to which the state said he pled guilty. Davis also remembered stating at the plea hearing that the police had coached him through their initial interview with him about the murder of Lynch. On redirect,

Davis admitted that he remembered that the plea agreement was reached because he promised to testify truthfully at Caine's trial.

3. While testifying, Davis admitted to remembering the following facts: (1) the assault rifle came from a theft that Davis, Reese, Jackson and Lynch had done; (2) the deal with Jackson and Lynch was made because Jackson wanted sole possession of the assault rifle; (3) Davis was not in the room during the shooting; and (4) the identification of the jacket Caine was wearing on the day of the incident.

might be lacking memory at trial, which constituted cross-examination about the circumstances of the prior testimony. More particularly, on cross-examination Davis indicated that perhaps he lied at his plea hearing but he cannot tell the truth now because the State threatened him. Therefore, we conclude that Davis was subject to the cross-examination required under Minn. R. Evid. 801(d)(1)(A), and accordingly we conclude that the district court did not err when it admitted Davis's guilty plea testimony.

*Relevant parts of Davis's guilty plea testimony*

■ Caine argues that even if Davis's guilty plea testimony was admissible under Minn. R. Evid. 801(d)(1)(A), parts of the testimony were inadmissible. *See* Minn. R. Evid. 402–03. At trial, Caine requested a redaction of only one part of the transcript and the district court granted his request. Because Caine failed to object to any other parts of the transcript, we will reverse only if the court committed a plain error that affects substantial rights. *Anderson*, 733 N.W.2d at 134.

■ Caine first argues that the parts of Davis's plea transcript that contained his waiver of rights and plea of guilty were inadmissible. We stated in *State v. Cermak* that "generally evidence of a plea of guilty, conviction or acquittal of an accomplice of the accused is not admissible to prove the guilt or lack of guilt of the accused." 365 N.W.2d 243, 247 (Minn. 1985). But in *State v. Dukes* we reasoned,

> [t]he distinguishing feature from *Cermak* * * * is that [the witness's] account of events leading up to and after the crime was not offered to establish [the witness's] guilt, as was the case in *Cermak*, but rather for the value of the first-hand narrative of what happened.

Therefore, we conclude that the plea admission was not barred by the rules of criminal procedure, rules of evidence, or *Cermak*.

544 N.W.2d 13, 18 (Minn.1996) (holding the admission of an accomplice's plea transcript under Minn. R. Evid. 804(b)(3) was not error), *abrogated in part on other grounds, State v. Dahlin*, 695 N.W.2d 588, 595–96 (Minn.2005). Similarly, in this case, the entire guilty plea transcript was offered as a "first-hand narrative," in lieu of Davis's testimony, "of events leading up to and after" Lynch was shot. Therefore, we conclude that the district court did not commit plain error when it admitted Davis's guilty plea or waiver of rights as part of Davis's non-hearsay statement under Minn. R. Evid. 801(d)(1)(A).

■ Caine also argues that the attorney and court statements in the guilty plea transcript was inadmissible because they are not Davis's statements. But we have held that statements of third parties may be admissible to provide context for the responses and admissions sought to be admitted. *State v. Tovar*, 605 N.W.2d 717, 726 (Minn.2000) (holding that an interview including police statements was admissible because the police statements were offered not "for their truth, but rather to give context to [the defendant's] responses and admissions on the tape"); *but see Bernhardt v. State*, 684 N.W.2d 465, 475–76 (Minn.2004). Davis's plea transcript consists largely of either the attorneys or the court making statements and asking Davis if the statements are correct. The third party statements provide context for Davis's responses. Thus, we conclude it was not error, much less plain error, to allow the other parties' statements to be submitted to the jury.

■ Caine also claims that the parts of the transcript where Davis responded with a nod or "Um-hmm" were unclear and so

were confusing and misleading. While such responses are not ideal, it was not error to admit these responses because we conclude that the clear "yes" answers that come directly before and after the unclear responses provide enough context to avoid any ambiguity.

*Admission of Davis's guilty plea transcript as an exhibit*

 Caine argues that even if the content of Davis's prior guilty plea testimony was admissible, the district court erred in admitting the transcript itself into evidence. Caine likens the admission of Davis's plea testimony under Minn. R. Evid. 801(d)(1)(A) to the admission of a recorded recollection under Minn. R. Evid. 803(5), which allows the record to be read into evidence but not to be admitted as an exhibit unless offered by an adverse party. At trial, Caine never requested that the transcript be read into the record instead of being submitted to the jury. Therefore, we also review this claim for plain error.

Under Minn. R. Evid. 613(b), extrinsic evidence of a prior inconsistent statement for impeachment purposes is admissible if "the witness is afforded a prior opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Davis was given the chance to explain or deny his guilty plea testimony while on the witness stand in Caine's trial, and Caine was able to question Davis about the testimony during cross-examination. Therefore, we conclude that the requirements were met for the transcript to be admissible under Rule 613(b).

Transcripts have also been held to be the appropriate form of evidence for submitting a prior inconsistent statement for

substantive purposes under the parallel Federal Rule of Evidence 801(d)(1)(A). *E.g., United States v. Coran,* 589 F.2d 70, 76 (1st Cir.1978). Moreover, Caine's analogy to Minn. R. Evid. 803(5) is inapt. The comment to Rule 803(5) indicates that "[t]he provision that the *hearsay* document will not be received as an exhibit is intended to prevent the jury from placing undue emphasis on the statement." Minn. R. Evid. 803(5) comm. cmt.—1989 (emphasis added). But these concerns about undue emphasis apply to hearsay statements, and statements admitted under Rule 801(d)(1)(A) are expressly non-hearsay. We therefore conclude that it was not error for the district court to admit Davis's guilty plea transcript into evidence.

*Admissibility of Davis's guilty plea transcript after the State rested its case*

 Caine also argues that the admission of Davis's guilty plea transcript *after* the State rested its case prevented him from effectively cross-examining Davis about his guilty plea testimony. But this claim lacks merit because the State moved to admit the transcript during its direct examination of Davis. Thus, Caine was on notice before he cross-examined Davis that the transcript might be admitted. Because Caine had ample time to prepare to cross-examine Davis about his plea testimony, we conclude that the district court did not err when it admitted the transcript after the State rested its case. Based on all of our foregoing conclusions, we hold that the district court did not err when it admitted Davis's guilty plea transcript.

## II.

 Caine also argues that it was error for the district court to deny his request to re-cross-examine Davis after admitting Davis's plea transcript.[4] We re-

4. The chain of events concerning the tran- script and examination of Davis was as fol-

view the disposition of a party's request to reopen its case after the party has rested under an abuse-of-discretion standard. *State v. Daniels*, 361 N.W.2d 819, 831 (Minn.1985); *State v. Jouppis*, 147 Minn. 87, 89, 179 N.W. 678, 679 (1920) ("Whether a party shall be permitted to reopen his case * * * after he has rested, is generally within the discretion of the trial court * * *.").

In *Jouppis*, we held that it was an abuse of discretion to deny the defendant's request to reopen the case because (1) the request was made right after the defense rested; (2) the evidence was material, not cumulative, and concerned a controlling issue; and (3) there was no improper purpose for failing to produce the evidence earlier. 147 Minn. at 89–90, 179 N.W. at 679. Conversely, in holding that it was not an abuse of discretion to deny the defendant's request to reopen the case in *Daniels*, we noted that "the defense knew of [the] evidence, and of its possible relevance, before it rested, yet chose to rest anyway." 361 N.W.2d at 831 n. 1.

In this case, Caine did not make the request to reopen his case until both the State and he had rested—just before closing arguments. Further, Caine knew about the admission of the transcript for both impeachment and substantive purposes before he began his case-in-chief and decided to rest his case anyway. Additionally, Caine had the opportunity to question Davis before starting his case-in-chief, and the requested reopening apparently would have been for the purpose of further cross-examining Davis, not introducing new direct testimony. Caine offers no reason-

able explanation as to why he needed to re-cross-examine Davis. The district court did attempt to discern what Caine wanted to achieve, but Caine provided no concrete answers. We therefore hold that the court did not abuse its discretion when it denied Caine's request to reopen his case.

### III.

 While Caine did not object to the jury instruction on duress during trial, he now argues that the district court erred when it "failed to inform the jury that it must be proven 'beyond a reasonable doubt' that Caine did not act under duress before [the jury] could return a verdict of guilty." Jury instructions must "adequately instruct the jury on the State's burden to prove defendant's guilt beyond a reasonable doubt." *State v. Auchampach*, 540 N.W.2d 808, 816 (Minn.1995). Nevertheless, district courts have "considerable latitude in selecting language for jury instructions"; a particular instruction is therefore error only "if it materially misstates the law." *State v. Moore*, 699 N.W.2d 733, 736 (Minn.2005). If a defendant does not object to an instruction at trial, we will reverse for plain error "if the instructions were misleading or confusing on fundamental points of law." *State v. Ihle*, 640 N.W.2d 910, 916 (Minn.2002). We review instructions "as a whole, in their entirety," when determining their sufficiency. *Auchampach*, 540 N.W.2d at 816.

In *State v. Charlton*, we addressed whether the jury instructions given by the district court impermissibly shifted the

---

lows: (1) the state moved to admit the transcript during its direct examination of Davis; (2) during Davis's direct examination, the court heard arguments by both parties about the admissibility of the transcript; (3) defense counsel submitted to the court a memorandum in support of its objection to the tran-

script's admission; (4) defense counsel cross-examined Davis; (5) the transcript was admitted just before the state rested; and (6) after both parties had rested, defense counsel suggested for the first time that the court reopen the case and put Davis back on the stand.

burden of proof on the element of intent from the State to the defendant when the instructions indicated that duress is an affirmative defense that the defendant has the burden of proving by a fair preponderance of evidence.[5] 338 N.W.2d 26, 27–28 (Minn.1983). We held that the court's instructions were erroneous because they placed the burden of persuasion on the defendant instead of the State. *Id.* at 31. Nevertheless, we affirmed the defendant's conviction because we concluded that the instructions, when considered with the evidence presented on the element of intent, were harmless error because there was no "material and substantial prejudice" to him. *Id.*

In *Charlton,* we also stated that the appropriate jury instruction for a duress defense was contained in the CRIMJIG in effect at the time, which stated that " '[t]he burden of proof on this issue is on the State; unless you find beyond a reasonable doubt that the defendant did not act as he did because he had a reasonable fear of imminent death, defendant is not guilty.' " *Id.* at 29 n. 6, 31 (quoting 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 7.01 (1st ed. 1977)). Here, the current CRIMJIG 7.01 instruction was read to the jury almost verbatim. *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG

7.01 (5th ed. 2006). But CRIMJIG 7.01 has been altered since *Charlton.* While both versions indicate that the burden of proof is on the State to prove lack of duress, the current version does not include an explicit statement that the State has the burden to prove lack of duress *beyond a reasonable doubt.*

 In this case, the district court gave the following instruction to the jury:

The defendant is not guilty of a crime if the defendant participated in the crime only because of a reasonable fear caused by the threats of another person engaged in the commission of the crime that the defendant would be immediately killed if he refused to participate in the commission of the crime. *The burden of proof on this issue is on the state. The state must prove that the defendant did not engage in the commission of the crime because of a reasonable fear of imminent death. If the state does not so prove, the defendant is not guilty.*

That threats of future danger to the defendant's life have been made is not a defense. The defendant's reasonable fear of instant death must continue throughout the time the crime is being committed, and it must not have been possible for the defendant to withdraw in safety.

---

**5.** In *Charlton,* the court instructed the jury on the duress claim as follows:

The defendant * * * claims he is not guilty because he acted under duress. Having made this claim as an affirmative defense, the defendant has the burden of proving it by a fair preponderance of the evidence in order to be relieved of criminal responsibility for his acts, if you find that the State has proven all of the essential elements of the crime charged.
* * * *
Although the defendant, having raised the affirmative defense of duress, has the burden of presenting evidence of duress and

the burden of establishing his claim of duress by a fair preponderance of the evidence, the State still has the ultimate burden of proving beyond a reasonable doubt defendant's intent to commit the crime of aggravated robbery. * * *

If you find that the State has proven beyond a reasonable doubt all of the essential elements of the crime charged, aggravated robbery, and also find that the defendant has not proven his claim of duress by a fair preponderance of the evidence, you would then find the defendant guilty.
338 N.W.2d at 28 n. 5.

(Emphasis added). This instruction did not explicitly require the State to prove lack of duress *beyond a reasonable doubt.* When intent is an element of the offenses for which a defendant is charged, it is necessary for the court to fully explain the State's burden to prove intent. This means that when a duress defense is sufficiently raised, as it was here, a full explanation includes that the State must disprove, beyond a reasonable doubt, defendant's claim of lack of intent. Therefore, we conclude that the court erred when it used a duress instruction that failed to instruct the jury on the level of proof necessary for the State to disprove duress.

 The current CRIMJIG instructions that were read to the jury in this case included what we required in *Charlton*—the burden is on the State to prove lack of duress and if the State fails to meet its burden, Caine is not guilty. In *Charlton* we said that the burden to prove intent must be on the State and that CRIMJIG 7.01 was a proper instruction. But we did not state what exactly made 7.01 proper. We therefore conclude it was not *plain* error for the district court to read the current CRIMJIG instructions to the jury, despite the fact that the instructions did not include the level of the burden of proof on the State.

 Further, when considering the district court's instructions as a whole, we conclude that the instructions were not "misleading or confusing on fundamental points of law," *Ihle,* 640 N.W.2d at 916, because the State's burden to prove *each* element—including the element of intent—*beyond a reasonable doubt* was made clear throughout the rest of the instructions. This is evidenced by the following instructions:

> Mr. Caine is presumed innocent of the charges made, and that presumption abides with him unless and until he has been proved guilty beyond a reasonable doubt. * * *

> The burden of proving guilt is on the state. The defendant does not have to prove his innocence.

> Proof beyond a reasonable doubt is such proof as ordinarily prudent men and women would act upon in their most important affairs. A reasonable doubt is a doubt based upon reason and common sense. It does not mean a fanciful or capricious doubt, nor does it mean beyond all possibility of doubt.
>
> * * * *
>
> You must consider these instructions as a whole and regard each instruction in the light of all the others. * * *
>
> * * * *
>
> If you find that each of [the elements of first-degree murder] has been proven beyond a reasonable doubt, the defendant is guilty. If you find that any element has not been proven beyond a reasonable doubt, the defendant is not guilty.
>
> * * * *
>
> If you find that each of [the elements of second-degree murder] has been proven beyond a reasonable doubt, the defendant is guilty. If you find that any element has not been proven beyond a reasonable doubt, the defendant is not guilty.
>
> * * * *
>
> If you find that each of [the elements of unintentional murder] has been proven beyond a reasonable doubt, the defendant is guilty. If you find that any element has not been proven beyond a reasonable doubt, the defendant is not guilty.

Because the court, as required by *Charlton,* made clear that the burden was on the State to disprove duress, and because the

instructions as a whole made numerous references to the State's burden to prove Caine's guilt beyond a reasonable doubt, we hold that the district court's failure to instruct the jury on the State's level of burden of proof to disprove duress, although erroneous, did not constitute plain error and further did not affect Caine's substantial rights.

### IV.

We next address Caine's claim that the State failed to meet its burden of proving beyond a reasonable doubt that Caine was not under duress when he killed Lynch. When a conviction is challenged based on sufficiency of the evidence, "we are limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach their verdict." *State v. Hatfield,* 639 N.W.2d 372, 375 (Minn.2002).

There are three elements to the duress defense: "(1) [defendant], due to threats, was under a present reasonable apprehension of instant death should he refuse to participate in the crime; (2) fear of instant death must have continued throughout the commission of the crime; and (3) defendant could not safely withdraw." *Charlton,* 338 N.W.2d at 31. The defendant "is required to adduce sufficient evidence on duress to make the defense one of the issues of the case." *Id.* at 30. But once the defendant meets this standard, the burden shifts to the State "to show lack of duress, or its converse, specific intent." *Id.* at 30–31.

Based on the record, we conclude that it was reasonable for the jury to infer that Caine intended to shoot Lynch. The State presented evidence that Caine brought the shotgun to Jackson's house. Further, Davis's plea testimony indicated that Reese, Davis, *and* Caine decided to rob

Jackson and Lynch before they went to Jackson's house. Caine admitted that while in Jackson's bedroom he was holding and pumping the shotgun. Caine also admitted that he shot Lynch. Caine then fled the scene, which we have held is evidence of consciousness of guilt. *State v. Bias,* 419 N.W.2d 480, 485 (Minn.1988). The jury was shown pictures of Lynch's perfectly centered fatal gunshot wound, which supports an inference that the wound could not have been caused accidentally by Caine closing his eyes and shooting while Lynch happened to jump up at the same time. The medical examiner stated that the wound was consistent with a close contact shot and with Lynch getting shot while trying to get off the ground. Based on the foregoing evidence, we conclude that the jury could have reasonably found Caine shot Lynch intentionally and was not acting under duress. Therefore, we hold that the State met its burden of proving beyond a reasonable doubt that Caine intentionally killed Lynch.

### V.

Caine argues that the district court erred when it declined to give the jury an instruction on first-degree manslaughter under Minn.Stat. § 609.20(3) (2006) because his defense theory and the evidence presented at his trial could support a finding that he intentionally shot Lynch because (1) he was coerced by Reese's threats, and (2) Reese was not a coconspirator. We review the denial of a defendant's request for a lesser-included offense instruction for abuse of discretion. *State v. Johnson,* 719 N.W.2d 619, 625 (Minn.2006). Reversal is warranted only if the defendant was prejudiced. *State v. Dahlin,* 695 N.W.2d 588, 598–99 (Minn. 2005).

 The district court is required to instruct the jury on a lesser offense if "1) the lesser offense is included in the charged offense; 2) the evidence provides a rational basis for acquitting the defendant of the offense charged; and 3) the evidence provides a rational basis for convicting the defendant of the lesser-included offense." *Id.* at 598. In determining whether an instruction is appropriate, the court must "look at the evidence in the light most favorable to the party requesting the instruction." *Id.* An offense is a lesser-included offense if it is "[a] lesser degree of the same crime" or "[a] crime necessarily proved if the crime charged were proved." Minn.Stat. § 609.04, subd. 1(1), (4) (2006). We have held that first-degree manslaughter under Minn.Stat. § 609.20(1) (2006) is a lesser-included offense of first-degree murder. *State v. Brocks,* 587 N.W.2d 37, 41 (Minn.1998); *see Johnson,* 719 N.W.2d at 625–26.

 Minnesota Statutes § 609.20(3) provides that an actor is guilty of manslaughter in the first degree if the actor

> intentionally causes the death of another person because the actor is coerced by threats made by someone other than the actor's coconspirator and which cause the actor reasonably to believe that the act performed by the actor is the only means of preventing imminent death to the actor or another.

*See also* 9 Henry W. McCarr & Jack S. Nordby, *Minnesota Practice—Criminal Law and Procedure* § 47.17 (3d ed. 2001) (defining manslaughter under section 609.20(3) as "an intentional killing under duress"). Therefore, the district court would not have erred when it denied Caine's request for a manslaughter instruction if there was no rational basis for the jury to conclude that Caine killed Lynch intentionally because he was under duress and that Caine was not Reese's coconspirator.

The State argues that the district court properly refused to give the manslaughter instruction under section 609.20(3) because Caine's case theory was that he did not kill Lynch intentionally. But the charges against a defendant do not hinge on the defendant's defenses or case theory. Moreover, the State offered evidence that Caine killed Lynch intentionally. Further, because instructions were given on two other intentional murder charges, Minn. Stat. § 609.185(a)(3) (2006) and Minn.Stat. § 609.19, subd. 1(1) (2006), the court evidently concluded that there was sufficient evidence to support a jury instruction on offenses that required a finding that Caine intentionally shot Lynch. Because there was a rational basis for the jury to find that Caine killed Lynch intentionally, we conclude that the State's argument that the court properly declined to give a section 609.20(3) instruction because Caine's case theory was that he killed Lynch unintentionally lacks merit.

 Nevertheless, for a denial of Caine's request to be error, there must be a rational basis for the jury to find that Reese's threats coerced Caine into killing Lynch and that Caine was not Reese's coconspirator. *See* Minn.Stat. § 609.20(3). In support of his defense, Caine testified that he did not bring a gun to Jackson's house, he only began to participate in the robbery when Reese started threatening him, he feared for his life all the way up through the time that he shot Lynch, and he only shot Lynch because Reese was holding a gun to his head. Much of Caine's testimony was corroborated by Jackson. But even Caine admits that he picked up the shotgun, pumped it, and kept it in his hands while Reese threatened and robbed Jackson and Lynch at gunpoint. Caine picking up the shotgun,

pumping it, and continuing to hold it during the robbery made Caine a coconspirator in the robbery because his actions aided Reese.

Based on the foregoing coconspirator evidence, there would appear to be no rational basis for a jury to find Caine guilty of first-degree manslaughter under Minn. Stat. § 609.20(3). Nevertheless, Caine argues that if we look at this evidence in the light most favorable to him, he was not Reese's coconspirator in the robbery because he only picked up the shotgun out of duress caused by Reese's threats. If this is the case then Caine would have lacked the requisite intent to be Reese's coconspirator and thus a jury could have found him guilty of manslaughter. But a finding that Caine only participated in the robbery because he was under duress requires that he "was under a present *reasonable* apprehension of instant death should he refuse to participate in the crime." *Charlton*, 338 N.W.2d at 31 (emphasis added). The facts do not support a finding that Caine's fear of death was *reasonable* after he picked up the shotgun. First, Reese telling Caine to pick up the gun while Reese kept his gun pointed at Jackson and Lynch made it clear that Reese's initial threats about killing everyone were not aimed toward Caine. Second, it would not be reasonable for Caine to think that he was in danger of instant death when Reese let Caine arm himself. Finally, because Caine was armed, he could have safely withdrawn. All of these facts preclude a finding that Caine participated in the robbery because he was under duress.

Because a jury could not have found that Caine assisted with the robbery because he was under duress, it follows that no jury could have found that Caine was not Reese's coconspirator in the robbery. Thus, based on Caine's own testimony, even if he did not intend to rob Jackson and Lynch initially, by picking up the shotgun Caine became Reese's coconspirator. We therefore conclude that even if the jury believed that Caine was coerced into killing Lynch because Reese was holding a gun to Caine's head when Caine shot Lynch, Reese's threats could not be a basis for the jury to find that Caine was guilty of manslaughter under Minn.Stat. § 609.20(3) because Caine was Reese's coconspirator in the robbery. Because we conclude there was no rational basis for the jury to convict Caine of manslaughter, we hold that the district court did not abuse its discretion when it denied Caine's request to instruct the jury on first-degree manslaughter under Minn.Stat. § 609.20(3).[6]

## VI.

Finally, Caine claims that the State engaged in several forms of misconduct that warrant reversal of his conviction. When a defendant fails to object to prosecutorial misconduct at trial, he ordinarily "forfeits appellate consideration of the issue." *State v. Ramey*, 721 N.W.2d 294, 297 (Minn.2006). But we may review such conduct under the plain error doctrine. *Id.* In the context of unobjected-to prosecutorial misconduct, once error is shown, the burden is on the State to demonstrate that its plainly erroneous misconduct "did not prejudice the defendant's substantial rights." *Id.* at 299–300. But even if the plain error test is met, we must still decide whether we should address the

---

**6.** We acknowledge that aspects of the concurrence have appeal as an alternative analysis of the lesser-included offense issue. Nevertheless, we conclude that ultimately the approach taken by the concurrence raises more questions than it answers. Moreover, the answers to these questions are not determinative in this case.

error "to ensure fairness and the integrity of the judicial proceedings." *Id.* at 302.

### Prosecutorial threats

■■■ Caine claims that the State pressured Davis into silence by threatening Davis with more prison time and threatening to make his life "hell" in prison if he did not testify the way the State wanted him to testify. The State argues that it did not intimidate Davis but only warned him about the consequences of perjury. In *Opsahl v. State*, we held that the State's warnings about the consequences of committing perjury, even when inaccurate, are appropriate. 710 N.W.2d 776, 783 (Minn. 2006). Our holding was supported by numerous factual findings, including that (1) "no witnesses were so intimidated that they did not testify"; (2) two of the witnesses testified favorably for the defendant; (3) the witnesses were properly warned about the consequences of perjury, even if the prosecutor misstated the potential for liability; (4) the State was questioned about its detective's behavior at the hearing; and (5) five witnesses testified that the State did not intimidate them. *Id.* In this case, Davis intimated that his loss of memory was a result of threats by the State. But, as discussed above, Davis nonetheless testified favorably to Caine in some respects. Further, Sergeant Zimmerman, the investigator present at the interview in question, testified that the prosecutors only warned Davis that if he lied it would be perjury. As *Opsahl* indicates, such warnings about the consequences of perjury are proper. Based on Zimmerman's testimony that the prosecutors did not threaten Davis and the fact that Davis did, in some respects, testify favorably to Caine, we conclude that there was no prosecutorial misconduct concerning threats to witnesses in this case.

### Hearsay testimony of threats made to Davis's girlfriend

■■■ Caine argues that the State engaged in misconduct when it elicited testimony from Sergeant Zimmerman on rebuttal that Caine's family had threatened Davis's girlfriend. The State may offer evidence in rebuttal of the defense evidence. Minn. R.Crim. P. 26.03, subd. 11(g). Rebuttal evidence is evidence that "explains, contradicts, or refutes the defendant's evidence." *State v. Swanson*, 498 N.W.2d 435, 440 (Minn.1993). In this case, Caine first elicited hearsay statements made by Davis concerning threats to Davis's girlfriend. We therefore hold that it was not error for the State to question its rebuttal witness to refute Caine's claim that Davis said no one ever threatened his girlfriend.

### Improper closing arguments

■■■ Caine also argues that, like improper "were they lying" questions posed to one witness about another witness, the State impermissibly argued during closing argument that the jury must find that the State's witnesses were lying in order to acquit Caine. We have held that "were they lying" questions can impermissibly create "the impression that the jury must conclude that * * * witnesses were lying in order to acquit" the defendant. *State v. Morton*, 701 N.W.2d 225, 235 (Minn.2005). Such questions are permissible, however, "in the circumstance when the defendant '[holds] the issue of the credibility of the state's witnesses in central focus.'" *Id.* (quoting *State v. Pilot*, 595 N.W.2d 511, 518 (Minn.1999)). Here, Caine did not dispute many of the facts that were presented by the State's witnesses but instead emphasized favorable facts and pointed out that the witnesses were either mistaken or had no knowledge of facts surrounding the

incident and Caine's intent.[7] "Were they lying" questions would therefore be impermissible in this case.

██ But we conclude that the State's closing argument did not include statements analogous to "were they lying" questions. The State made statements such as "what we've got is a credibility determination"; "it really has come down to who are you going to believe"; and "I want you to contrast [Caine's] testimony with Jermaine Jackson * * *. And we're back to [Jackson's] credibility versus the defendant's." It is the job of a jury to determine the credibility of the witnesses. In fact, in this case the district court instructed the jury that it is up to the jury to decide which witnesses to believe and explained what factors to consider in making this determination. Whether the jury believed Caine was the crucial question in the case because a great deal of evidence, both testimonial and physical, pointed to the fact that Caine did intentionally shoot Lynch. The only contrary evidence was Caine's testimony. The State telling jury members during closing arguments that they must decide who they believe is not analogous to "were they lying" questions of witnesses on the stand. We therefore conclude that the State did not make improper closing argument statements.

For all the foregoing reasons, we hold that the State did not commit acts of prosecutorial misconduct during Caine's trial; therefore, we conclude that a new trial is not warranted on these grounds.

Affirmed.

DIETZEN, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

7. For example, when cross-examining Jackson, the defense attorney never attempted to expose Jackson as a liar but instead focused on eliciting truthful testimony from Jackson

GILDEA, Justice (concurring).

I join in the majority's conclusion that Caine's conviction should be affirmed. I write separately because I disagree with the way in which the majority resolves the issue relating to the lesser-included offense of first-degree manslaughter under Minn.Stat. § 609.20(3) (2006). In my view, we need not decide whether it was error to refuse to give this instruction because any error was not prejudicial.

The district court instructed the jury on Caine's duress defense that "[t]he defendant is not guilty of a crime if the defendant participated in the crime only because of a reasonable fear caused by the threats of another * * * that the defendant would be immediately killed if he refused to participate in the commission of the crime." Under this instruction, in order to accept the defense, the jury would have had to find that Caine committed the murder because he reasonably believed that if he did not kill Lynch, Caine would be killed. *See* Minn.Stat. § 609.08 (2006) (stating that a defendant is excused from criminal liability for a crime that was committed because the defendant had "a reasonable apprehension * * * that in case of refusal [he] is liable to instant death"). Indeed, Caine's lawyer argued to the jury during closing argument that Caine "had a reasonable fear of death if he didn't" kill Lynch. The jury rejected this defense when it found Caine guilty.

Similar to the duress instruction given, the lesser-included offense instruction would have required the jury to find that Caine reasonably believed that he had to kill Lynch in order to prevent his own

concerning the incident, attempting to emphasize those facts that would help support the defense of duress.

death. Minn.Stat. § 609.20(3) (defining manslaughter as "intentionally caus[ing] the death of another person because the actor is coerced by threats * * * which cause the actor reasonably to believe that the act performed by the actor is the only means of preventing imminent death to the actor or another"). Because the jury rejected the theory that Caine reasonably believed he had to kill Lynch in order to save his own life when it rejected his duress defense, Caine has not shown that he was prejudiced by the district court's failure to give the lesser-included offense instruction. *See State v. Dahlin,* 695 N.W.2d 588, 599 n. 2 (Minn.2005) ("[A]ppellate courts must consider the jury instructions given and the verdict actually rendered to determine whether a possibility exists that the jury could have returned a verdict of guilty on *only* the requested lesser-included offense instruction. If so, the defendant is prejudiced and the court's failure to give the instruction is reversible error."). I would therefore hold that any error was harmless.

RUSSELL A. ANDERSON, C.J. (concurring).

I join in the concurrence of Justice Gildea.