*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-2045**

State of Minnesota,
Respondent,

vs.

Melody June Fay,
Appellant.

**Filed October 19, 2015
Affirmed
Peterson, Judge**

Todd County District Court
File No. 77-CR-13-1123

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Charles G. Rasmussen, Todd County Attorney, Michael J.G. Schnider, Assistant County Attorney, Long Prairie, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Sara L. Martin, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Peterson, Presiding Judge; Stauber, Judge; and

Klaphake, Judge.[*]

_____

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**PETERSON**, Judge

In this appeal from convictions of third-degree burglary and theft - taking from a person with a superior right of possession, appellant argues that (1) the evidence was insufficient to convict her of burglary or theft of her own horse because the state failed to prove that the owner of a horse-boarding facility had a superior right of possession to the horse, and (2) appellant was deprived of a fair trial by jury instructions that materially misstated the law and highlighted evidence favorable to the state. We affirm.

## FACTS

In April 2013, appellant Melody Fay was living in the Alexandria area and boarding her three horses near her former residence located about three hours away from Alexandria. On April 21, 2013, Fay made a telephone call to G.E., who operates a horse-boarding facility in the Alexandria area, and asked about boarding some horses. G.E. testified that during the phone call, he told Fay that the price would be $150 per horse. Fay made an appointment to meet G.E. at the boarding facility the next day. G.E. testified that, when he met with Fay, it was his understanding that the monthly price for boarding would be $150 for each of her three horses. After meeting with G.E. on April 22, Fay had her horses transported to the boarding facility.

Fay testified that after meeting with G.E. on April 22, she understood that the price would be $250 a month to pasture the horses as long as she provided their grain. G.E. kept a handwritten ledger showing the amounts owed and payments made by Fay. The ledger showed that Fay owed $113 for the week in April and $450 per month for

2

May through September. The ledger shows payments of $200 on April 26, $50 on May 10, $250 on June 10, $250 on July 24,[1] $250 on August 29, and $250 on September 11. G.E. testified that he sent Fay a copy of the ledger at the beginning of every month.

Fay included notes with some of her payments. A note dated July 1 states: "Sorry things so messed up been dealing with some family issues – trying to get better job – jobs – You have any or any work I can do? I love those 3 . . . ." Fay testified that the note referred to the fact that she was having a hard time paying $250 a month and was not an acknowledgment that she owed more. Fay testified that she apologized because she was paying the $250 "in bits and pieces each time I went out there." An undated note states: "So sorry – No hours @ work = No $ Will catch up – Can't afford $450.00 for pasture – Any ideas?? Work?" Fay testified that this note also referred to the fact that it was difficult for her to pay $250 a month and that she wrote the apology and promise to "catch up" because she "was behind on the $250 a month almost always," sometimes leaving part of it unpaid "until the very end of the month."

G.E. did not provide Fay with a written contract until late July or early August. Fay testified that G.E. said he needed the contract for "liability reasons." Fay read through the contract and noticed that it provided for a $450 monthly charge for boarding her three horses. She testified that she signed it because she understood that G.E. needed it for liability reasons. Fay circled the $450 and wrote in the margin, "I was hoping to work this dollar figure out. Confused a bit. Be out as soon as get paid next." The

---

[1] The ledger contains a notation about the July payment, which indicates that Fay made a payment of $250 in July with a check from a closed account and then made a cash payment of $250 on July 24.

3

contract required a two-week notice before a horse could be removed and stated, "No horse shall be released or leave [the boarding facility] until the complete bill for charges has been paid in full."

On September 12, Fay received a letter from [G.E.] that stated:

> I am sorry to have to go in this direction, but due to the fact that the board for your three horses is not and has never been current since May 1, 2013, you are being notified that the following action will be taken as of October 1, 2013. The 3 horses owned by you will be taken to a horse sale, sold and the sales price applied to the delinquent board. You will be notified as to the time and date of sale should you desire to buy them back.
>
> To avoid this action, you must notify us in writing by September 15, 2013 with what you plan to do to pay the outstanding amount due. Payment must be made in cash or bank check only before October 1, 2013. Horses cannot be removed from property until your account is paid in full.

Fay responded with a letter stating that she understood that the price for boarding her three horses was $250 per month and that she did not owe G.E. any money. On September 29, Fay went to the boarding facility when G.E. was there and removed two of her horses, but G.E. locked the third horse in the barn. On October 1, without G.E.'s permission, Fay entered the barn through a window and removed her third horse.

Fay was charged with one count of third-degree burglary in violation of Minn. Stat. § 609.582, subd. 3 (2012), and one count of felony theft for taking property from a person with a superior right of possession, in violation of Minn. Stat. § 609.52, subd.

4

2(a)(2) (2012), for removing the third horse from the barn.[2] A jury found Fay guilty as charged. The district court stayed imposition of sentence. This appeal followed.

**D E C I S I O N**

**I.**

*Statutory interpretation*

Theft occurs when a person "with or without having a legal interest in movable property, intentionally and without consent, takes the property out of the possession of a pledgee or other person having a superior right of possession, with intent thereby to deprive the pledgee or other person permanently of the possession of the property." Minn. Stat. § 609.52, subd. 2(a)(2). Third-degree burglary occurs when a person "enters a building without consent and with intent to steal or commit any felony or gross misdemeanor while in the building, or enters a building without consent and steals or commits a felony or gross misdemeanor while in the building." Minn. Stat. § 609.582, subd. 3. The predicate felony for Fay's burglary conviction was theft from a person with a superior right of possession. Thus, to sustain Fay's convictions, the evidence must be sufficient to prove that G.E. had a superior right of possession.

The parties dispute the meaning of "superior right of possession," which is not defined by statute. If a defendant challenges the evidence on the ground that her conduct is not prohibited by the applicable statute, the issue is one of statutory interpretation, which we review de novo. *State v. Colvin,* 645 N.W.2d 449, 452 (Minn. 2002). "We construe the words and phrases in a statute in accordance with their plain and ordinary

---

[2] Two other charges were dismissed.

5

meaning. . . ." *Johnson v. State,* 820 N.W.2d 24, 26 (Minn. App. 2012). "A rule of strict construction applies to penal statutes, and all reasonable doubt concerning legislative intent should be resolved in favor of the defendant." *Colvin,* 645 N.W.2d at 452.

The contract between Fay and G.E. stated, "No horse shall be released or leave [the boarding facility] until the complete bill for charges has been paid in full." The state argues that this language gave G.E. the right to retain Fay's horses until the boarding bill was paid in full. We agree. Minn. Stat. § 609.582, subd. 2(a)(2), expressly applies to "a pledgee." "A pledge is a bailment of personal property as security for a debt or other obligation." *Thoen v. First Nat'l Bank of Moorhead*, 199 Minn. 47, 50, 271 N.W. 111, 112 (1937) (quotation omitted). "To constitute a pledge, the pledgee must take possession, and to preserve it, must retain possession of the pledged property. If, after having taken possession, he relinquishes it, the pledge is extinguished." *Goembel v. Heesch*, 212 Minn. 424, 426, 4 N.W.2d 104, 105 (1942) (quotation omitted).

In *State v. Cohen*, the supreme court affirmed a larceny conviction when the owner of a fur coat hired a furrier to alter and repair the coat and then fraudulently absconded with the coat after refusing to pay the furrier, who had a statutory, possessory lien against the coat. 196 Minn. 39, 40-41, 263 N.W. 922, 923-24 (1935). The supreme court explained:

> An owner of personal property may be found guilty of larceny thereof when he wrongfully takes it from a pledgee or from one whom he has given possession for the purpose of having it cared for or repaired under statutes such as ours giving a lien therefor and the right to retain possession until the lien is paid.

6

*Id.* at 42, 263 N.W. at 924. The only distinction between this case and *Cohen* is that G.E. was a pledgee rather than the holder of a statutory lien. Because Minn. Stat. § 609.582, subd. 2(a)(2), expressly applies to "a pledgee," that distinction is not legally significant. Based on the contractual language prohibiting removal of a horse until the boarding bill is paid in full, a jury could find that by executing the contract, Fay pledged the horses as security for payment of the cost of boarding them.

*Sufficiency of evidence*

When considering a claim of insufficient evidence, we conduct "a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach their verdict." *State v. Caine,* 746 N.W.2d 339, 356 (Minn. 2008) (quotation omitted). We must assume that "the jury believed the State's witnesses and disbelieved the defense witnesses." *State v. Tscheu,* 758 N.W.2d 849, 858 (Minn. 2008). We will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the crime charged. *Bernhardt v. State,* 684 N.W.2d 465, 476-77 (Minn. 2004). "The assumption that the jury believed the state's witnesses is particularly appropriate when resolution of the case depends on conflicting testimony, as it is the function of the jury to evaluate the credibility of the witnesses." *State v. Pippitt*, 645 N.W.2d 87, 92 (Minn. 2009).

Fay argues that the evidence was insufficient to prove that she and G.E. agreed on the amount that Fay would pay each month to board her horses. "A contract requires a

meeting of the minds concerning its essential elements." *Minneapolis Cablesystems v. City of Minneapolis*, 299 N.W.2d 121, 122 (Minn. 1980). Viewing the evidence in the light most favorable to the verdict, as this court must, the evidence was sufficient to prove that Fay agreed to pay G.E. $450 a month to board her three horses. G.E. testified that he told Fay that the price to pasture the horses would be $150 for each horse, and the written contract states the price of $450 per month for the three horses. The handwritten ledger kept by G.E. also shows a charge of $450 per month, and G.E. testified that he provided a copy of the ledger to Fay every month. Fay paid $250 a month but left notes apologizing for being behind on payments. Although Fay claimed that she was apologizing for paying "in bits and pieces every month," the ledger shows payments of $250 at a time for the months June through September.

## II.

A district court is allowed "considerable latitude in the selection of language for jury instructions." *State v. Ihle,* 640 N.W.2d 910, 916 (Minn. 2002). This court views jury instructions in their entirety to determine whether they fairly and adequately explain the law. *State v. Flores,* 418 N.W.2d 150, 155 (Minn. 1988). If the instructions, read as a whole, correctly state the law "in language that can be understood by the jury, there is no reversible error." *State v. Peou,* 579 N.W.2d 471, 475 (Minn. 1998).

The district court instructed the jury:

> The elements of theft from a person with a superior right of possession are: First, [Fay] had a legal interest in livestock.[3] In this case a horse.
>
> Second, the livestock was in possession of [G.E.], and [Fay] took it from [G.E.'s] possession.
>
> The state offered evidence that, A, [Fay] gave possession of the horse to [G.E.] for the purposes of boarding the horse; B, there was a valid agreement between [Fay] and [G.E.] for boarding the horse; C, [Fay] failed to make the payments required under their agreement, and, D, the agreement provided that [G.E.] would retain possession of the horse until he was fully paid.
>
> If you find the State has proven these facts beyond a reasonable doubt, then [G.E.] had a right of possession of the horse superior to that of [Fay].
>
> Four, [G.E.] did not consent to [Fay's] taking possession of the livestock.
>
> Five, [Fay] intended to deprive [G.E.] permanently of possession of the livestock.

Fay argues that these instructions materially misstated the law because, to prove the offense of theft from a person with a superior right of possession, the state was required to prove beyond a reasonable doubt that G.E. had a valid security interest or a lien on Fay's horse. Fay contends that "[s]ecurity interests established by contract are governed by Chapter 9 of the Uniform Commercial Code," and the state failed to prove that the horse-boarding contract created a security interest under chapter 9.

---

[3] A previous version of Minn. Stat. § 609.52, subd. 2(a)(2), required the defendant to have a legal interest in the property. In 2005, that requirement was amended to "with or without a legal interest." 2005 Minn. Laws ch. 136, art. 17, § 31, at 1138.

9

But, under the plain language of Minn. Stat. § 609.52, subd. 2(a)(2), the state needed to prove that G.E. was a pledgee; it did not need to prove that G.E. had a valid security interest under the Uniform Commercial Code, or a lien. The instructions addressed all of the factual issues that the jury needed to resolve to determine whether Fay had pledged the horse that she took from the barn as security for payment of boarding charges. The third paragraph of the above-quoted instructions specifically instructed the jury to determine whether Fay gave G.E. possession of the horse and whether she pledged the horse as security for payment of the boarding charges. Read as a whole, the instructions correctly stated the law in understandable language.

Fay also argues that the instructions improperly highlighted the state's evidence. *See State v. Starfield*, 481 N.W.2d 834, 839 (Minn. 1992) (stating that jury instructions should not draw attention to particular kinds of evidence or single out a particular piece of evidence). The district court's instructions identified the factual issues that the jury needed to resolve and were consistent with the pattern instruction. 10 *Minnesota Practice*, CRIMJIG 16.04 (2006). The instructions did not highlight any particular evidence.

**Affirmed.**